1
2
3
4
5
6

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

7   AE H. KWON, *et al.,*

8        *Petitioners*,                        3:08-cv-00307-LRH-VPC
                                                 (Base File)
9
     vs.
10                                               ORDER

11   JIM BENEDETTI, *et al.*,

12        *Respondents*.

13

14        These consolidated habeas matters under 28 U.S.C. § 2254 come before the Court for a final

15   decision.  Petitioners challenge, *inter alia*, whether admission of coconspirator statements violated the

16   Confrontation Clause as well as the sufficiency of the evidence supporting Sung's conviction.

17                              ***Background***

18        Petitioners Ae H. Kwon and Yun Kyeong Sung were convicted, pursuant to jury verdicts after

19   separate trials, of one count each of extortion, conspiracy to commit extortion,  and witness soliciting

20   a bribe.  Their direct appeals were consolidated by the Supreme Court of Nevada in a single proceeding.

21   The state supreme court affirmed the convictions for witness soliciting a bribe, reversed the convictions

22   for extortion and conspiracy to commit extortion, and remanded for further proceedings.  The State did

23   not pursue a retrial on the reversed extortion and conspiracy charges on remand.

24        On federal habeas review, this Court similarly has consolidated the actions filed by the two

25   petitioners.  The Court expedited the matter early in the life of the case.  The Court did so in an effort

26   to avoid the possibility that the petitioners might be required to remain in protracted federal immigration

27   custody, but it does not appear from any material on file that petitioners in fact have been subject to

28   protracted federal immigration detention following their release from state custody.  The Court has

1  endeavored to reach the matter as promptly as its docket has permitted.  The fact that the petitioners no
2  longer are in state custody of course does not moot their petitions, given the presumed collateral
3  consequences of a conviction.  *See,e.g., Chaker v. Crogan*, 428 F.3d 1215, 1219 (9th Cir. 2005).

4         The Court will discuss particular facts regarding the specific claims as necessary in the
5  discussion of the respective claims.

6         In broad brush, Kwon and Sung were convicted of seeking to obtain money from Rene Angelil's
7  attorney, Martin Singer, in exchange for not providing Las Vegas police evidence necessary to continue
8  a criminal investigation into allegations by Sung that Angelil sexually assaulted her.

9         The evidence presented at the two trials – collectively – included the following.[1]

10        At the relevant time, Martin Singer was a name partner with an entertainment litigation firm in
11 Los Angeles, California.  His firm represented Rene Angelil.[2]

12        In approximately mid-May of 2000, attorneys for Sung and Kwon contacted Singer.  The
13 attorneys alleged that Angelil had fondled Sung in an elevator at the Imperial Palace Casino in Las
14 Vegas, followed her into her room, exposed himself, and then solicited sex from her.  The attorneys
15 made an initial settlement demand of $1,000,000.[3]

16        Thereafter, Singer dealt with "at least four or five lawyers" or law firms for Sung and Kwon over
17 the next approximately one month as lawyers were fired and replaced.  The settlement demand was
18 increased as lawyers were fired and replaced.[4]

19        / / / /

20

21        [1]The summary in the text is intended only as an overview of the basic factual particulars of the case in order to
22 provide context for the discussion of the issues.  Any absence of mention of specific evidence in this overview does not
   signify that the Court has overlooked or ignored that evidence in considering a particular issue.

23        The Court makes no credibility findings or other factual findings regarding the truth or falsity of evidence or
24 statements of fact in the state court.  The Court summarizes same solely as background to the issues presented in this
   case.  No statement of fact made in describing statements, testimony or other evidence in the state court, whether in this
25 overview or in the discussion of a particular issue, constitutes a finding by this Court.

26        [2]*Kwon Trial*: #33, Ex. 38B, at 44-45.  *Sung Trial*: #32, Ex. 24D, at I-3, 6, 59-60 & 64.

27        [3]*Kwon*: #33, Ex. 38B, at 45-48.  *Sung*: #32, Ex. 24D, at I-6-7 (with less detail).

28        [4]*Kwon*: #33, Ex. 38B, at 47-48.  *Sung*: #32, Ex. 24D, at I-13 (with less detail).

1      Ultimately, a settlement was reached in June 2000.  A settlement document was executed on

2  June 19, 2000.  The settlement papers and/or associated agreements  provided for, *inter alia*: (1) a

3  payment of $2,000,000.00 to Sung; (2) an apology by Angelil to Sung and Kwon; (3) the provision of

4  blood test results by Angelil; (4) a confidentiality agreement by Sung and Kwon; and (5) Sung and

5  Kwon turning over any physical evidence regarding the alleged incident.[5]

6      Some physical evidence allegedly from the incident was turned over following the execution

7  of the settlement document and payment of the settlement funds, including a water bottle and a note.[6]

8      Approximately 18 months later, at the end of 2001 and the beginning of 2002, Singer started

9  hearing once again from lawyers indicating that they were representing Kwon and Sung.  Once again,

10  Singer heard from four or five different lawyers or law firms as lawyers apparently were fired and

11  replaced.  Singer informed each succeeding counsel that there was a settlement agreement and stated

12  that Kwon and Sung had been fully paid for their claims.  Singer then would not hear about the matter

13  again until another new replacement lawyer subsequently contacted him.[7]

14      On March 13, 2002, Singer received a fax letter from Joseph Hong of the law firm of Hong &

15  Hong, from the firm's Las Vegas office address.  The letter stated: (1) that Hong's firm had been

16  retained the prior afternoon by Sung and Kwon in regard to the March 19, 2000, Imperial Palace

17  incident; (2) that the two-year statute of limitations would expire on Tuesday, March 19, 2002; (3) that

18  a civil complaint had been prepared and would be filed that Friday, March 15, 2002; and (4) that

19  immediate discussions were requested to resolve the matter due to the impending statute of limitations

20  deadline.  The letter requested a response at the Hong firm's  "LAS VEGAS" office.[8]

21      Singer informed Hong of the prior settlement, to no avail.  Hong thereafter filed a civil action

22  on March 15, 2002, on behalf of Sung and Kwon in state district court in Las Vegas seeking damages

23  from Angelil.  Singer's firm, with local Las Vegas civil litigation counsel, ultimately obtained a stay

24

25     [5]*Kwon Trial*: #33, Ex. 38B, at 48-54.  *Sung Trial*: #32, Ex. 24D, at I-10-14. #40, Ex. 56.

26     [6]*Kwon*: #33, Ex. 38B, at 50.  *Sung*: #32, Ex. 24D, at I-12 (with less detail).

27     [7]*Kwon*: #33, Ex. 38B, at 55 & 59-60.  *Sung*: #32, Ex. 24D, at I-14-17. #40, Ex. 56.

28     [8]*Kwon*: #33, Ex. 38B, at 55-60.  *Sung*: #32, Ex. 24D, at I-17. #40, Ex. 57 (emphasis in original).

of the civil action pursuant to a provision in the settlement document requiring mandatory confidential binding arbitration to resolve all disputes following upon the prior settlement.[9]

On the evening of March 19, 2002, two years to the day after the alleged March 19, 2000, incident, Sung reported the incident to the Las Vegas Metropolitan Police Department ("Metro").  She reported the incident as an alleged sexual assault by Rene Angelil.  Metro Detective Troy Barrett subsequently investigated the matter.  When he attempted to speak with Sung initially on the telephone, he found that she could speak only broken English.  He thereafter communicated with her counsel, Joseph Hong.  Barrett met with Hong and Kwon in May 2002.  Kwon gave Barrett, *inter alia*, a washcloth that he claimed had Angelil's semen, pubic hairs alleged to be from Angelil, a broken fingernail from Sung allegedly broken off during the alleged attack, hairs from Sung allegedly pulled from her head during the alleged attack, and a videotape of evidence.[10]

Thereafter, Las Vegas attorney Michael Olsen also was associated with Hong in representing Sung and Kwon.  When Olsen wrote to Singer, he wrote on a Las Vegas firm letterhead.  A demand for an additional $5,000,000.00 – over and above the original settlement amount – was made and then was withdrawn on July 25, 2002, through Hong.[11]

Shortly after the police investigation had started, David Chesnoff, a Las Vegas attorney for Angelil, contacted Detective Barrett's supervisors to inquire as to the investigation.  Barrett did not provide any information because Chesnoff represented the suspect.  He essentially told Chesnoff: "We'll contact you when we need you."  Thereafter, on September 30, 2002, Barrett contacted Chesnoff to seek to arrange the taking of a buccal swab from Angelil.[12]

During his investigation, Detective Barrett saw a red dress (also referred to as a jacket or coat) in the video obtained from Kwon.  He was informed at some point that the red dress was alleged to have Angelil's semen on it.  On October 3, 2002, Barrett met with Kwon, Sung and Hong.  He advised them

---

[9]*Kwon Trial*: #33, Ex. 38B, at 60-62.  *Sung Trial*: #32, Ex. 24D, at I-19-20, 25-27 & 68-73.

[10]*Kwon*: #33, Ex. 38B, at 16-23, 30-31 & 41-42.  *Sung*: #32, Ex. 24E, at II-38-44.

[11]*Kwon*: #33, Ex. 38B, at 62-63.  *Sung*: #32, Ex. 24D, at I-27-28. #40, Exhs. 58 & 59.

[12]*Kwon*: #33, Ex. 38B, at 38-40.  The Court did not locate corresponding testimony at the Sung trial.

1    that the dress was necessary for the investigation of the criminal case and that the case could not go

2    forward unless they produced the dress.  They were to deliver the dress to Barrett on October 8, 2002.[13]

3            On October 8, 2002, Hong contacted Barrett and requested an extension to October 17, 2002.

4    Barrett reluctantly agreed to the extension.  On October 17, 2002, the dress was not delivered, and no

5    one contacted Barrett as to it.  Barrett called Hong and asked whether the dress was in town.  Hong said

6    that it was not and sought another extension.  Barrett denied the request, told Hong that the case had

7    dragged on long enough, and advised him that he was closing the case due to an uncooperative victim.[14]

8            That same day, October 17, 2002, Barrett prepared a formal letter to Sung that he copied to

9    Hong.  The letter stated that it "serve[d] as written confirmation of our telephone call . . . [and that the

10   case] has been closed with a disposition of Victim Uncooperative . . . [due to Sung's failure] to provide

11   any and all evidence (red jacket) for prosecution of the felony crime of sexual assault."  Barrett sent the

12   letter by certified mail, return receipt requested, to Sung and Hong; and he received return receipts back

13   from both.  Barrett further received a letter from Sung on October 28, 2002, typed in English that " was

14   kind of confusing."  Sung expressed a concern in the letter that Barrett was going to arrest her.[15]

15           Meanwhile, on October 22, 2002, Singer received a fax letter signed by both Olsen and Hong.

16   They stated that they had met with Kwon and Sung the prior evening and that their clients authorized

17   them to seek, *inter alia*, $20,000,000.00, with the offer remaining open only through November 1, 2002.

18   They further  stated, *inter alia*, with regard to a pending discovery request by Singer "that much of the

19   discovery being sought, in terms of physical evidence of the alleged rape and documentation is in the

20   possession of the Las Vegas Metropolitan Police Department, pursuant to its investigation of our

21   client's charges."   They did not mention that -- as per Detective Barrett's October 17, 2002,

22   conversation with Hong five days before -- Metro already had closed its investigation.[16]

---

[13]*Kwon Trial*: #33, Ex. 38B, at 23-25 & 40-41.  *Sung Trial*: #32, Ex. 24E, at II-45-49.

[14]*Kwon*: #33, Ex. 38B, at 25-26 & 42-43.  *Sung*: #32, Ex. 24E, at II-49-50.

[15]*Kwon*: #33, Ex. 38B, at 25-27.  *Sung*: #32, Ex. 24E, at II-50-51 & 55-57.  #41, Ex. 80.

[16]*Kwon*: #33, Ex. 38B, at 64-65.  *Sung* #32, Ex. 24D, at I-28-30. #40, Ex. 59.

1      From October 24, 2002, through November 4, 2002, Hong and Olsen thereafter urgently sought

2 to contact Singer by telephone and by fax letter.  Hong and Olsen sought to impress upon Singer that

3 they needed to speak with him immediately and that time was of the essence.[17]

4      On November 5, Singer spoke with Hong by telephone.  Singer recorded the call.  During the

5 lengthy call, Hong stated, *inter alia*: (1) that he had not wanted to put anything in writing; (2) that he

6 was having a difficult time controlling Kwon and Sung and that they would "go buck wild" if he

7 withdrew, as "they can give a rats [sic] butt as to what happens from that point on;" and (3) that Sung

8 also had dark green underwear of Angelil's that had his sperm on it.[18]

9      During the November 5, 2002, call, Hong further stated as follows with regard to the criminal

10 case, which by had been closed on October 17, 2002:

| | | |
|---|---|---|
| HONG: | . . . .  What my client has told me is this, she also has a dark green underwear of Rene's, okay?  I don't know if you are aware of the criminal investigation as [sic] this stage, the detective handling this investigation has put a hold on it right now.  He wants, he doesn't even know about this dark green underwear, I just found out about this last week.  He wants the coat with the DNA on it, with Rene's DNA on it. My client right now has refused to turn that over because she believes that is the last piece of evidence that she needs to hang onto.  The detective has told us, if he gets that, it will be given to the DA and the DA will mandate or get a warrant for Rene to have a buckle [sic] swab and I don't know if you know what that means, that is . . . | |
| [SINGER]: | No. | |
| HONG: | A, it's a warrant where they get DNA from inside of Rene's mouth and then they are gonna compare that with the DNA on the towel, on the pubic hair and on the coat, okay?  That's what they are gonna do.  If the DNA matches, which we obviously believe that it will, then they are gonna move forward and charge him.  That's, that's the scenario. | |

---

[17]*Kwon Trial*: #33, Ex. 38B, at 65-69.  *Sung Trial*: #32, Ex. 24D, at I-30-31. #40, Exhs. 60 & 61.

[18]*Kwon*: #33, Ex. 38B, at 69-71 & 92-93.  *Sung*: #32, Ex. 24D, at I-32-35 . #43, Ex. 105 (transcript).  The tape was played and admitted into evidence at the Kwon trial, and transcript copies were provided to the jury while they listened to the recording.  The transcript itself was not admitted into evidence.  In the federal habeas matter, petitioners have presented the transcript (#40, Ex. 105) as an exhibit without challenging its accuracy.  This Court thus has referred to the transcript with regard to the content of the conversation.  In the Sung trial, Singer instead summarized the content of the conversation in his testimony, apparently due to playback equipment issues.  See #32, Ex. 24D, at I-94-95.

1                                    . . . . .

2       [SINGER]:        What is on the coat, is this my client's sperm?

3       HONG:           His sperm.  What has been turned over to the detective is
                        a towel with his sperm and pubic hairs that she found, as
4                       well as a broken finger nail, her broken finger nail.
                        Okay, that has been turned over to the detective and they
5                       have already processed those items.  The DA and the
                        detective is demanding this dress now.  They want this
6                       last piece, this dress with the sperm also.  My client right
                        now is saying no.  The DA is saying once we get this
7                       final piece with the dress, with the sperm on it, what we
                        are gonna do is get a warrant for Rene Angelil to submit
8                       to a buckle [sic] swab, which means they are gonna get
                        some DNA from inside his mouth, I think the inside
9                       walls of his check [sic] and then with that, they are gong
                        to compare it and analyze it with the DNA on the towel,
10                      on the pubic hair and on the dress and if it matches, they
                        are gonna charge him for rape.  That's that's where we
11                      are at right now.  My client has refused and obviously
                        that has caused some tension between me and her, but,
12                      she went with, she finally came in by herself and she
                        said, "look Mr. Hong, that's it, I've, I'm just, I can't take
13                      this no more, I want all this to go away, please call Mr.
                        Singer and see what you can do."  And I said, "well, what
14                      do you want me to do?"  She goes: "I want this case to be
                        resolved?"  I said, "what are you gonna do if it is
15                      resolved?"  She said, "I will go away and I will turn over
                        the dress to Mr. Singer, as well as the dark green
16                      underwear."  If that happens, then everything is over
                        because there will be no criminal investigation.
17                      Basically, the criminal investigation right now is at a
                        stalemate.  They are waiting [for] this dress and my client
18                      wants to resolve this and wants me to do what I can to
                        get this thing done and in return will give over
19                      everything, to you, which means there were no, it's over,
                        there's no criminal investigation, it's over.  That's where
20                      we're at.

21      [SINGER]:       So you are saying it's a dress and what else, what else is
                        it again she had?  A green?
22
        HONG:           Dark green Rene's dark green underwear.  And again,
23                      I'm just asking you, I think you are their agent or
                        business agent, what not, just look at this in the big
24                      picture, Marty and just step away, take off your attorney
                        hat, what . . .
25
        [SINGER]:       No, no.
26
        HONG:           . . Litigation, we can go to litigation . . . but what is that
27                      ultimately going to achieve.  Let's say you prevail in
                        arbitration, well do you think my clients are gonna go
28                      away, I mean no.  That's the, so, in essence, I think this

                                        -7-

whole case really, you got to look at this in how we can get this thing resolved for the benefit of your client in terms of wrapping it up and keeping everyone, keeping everyone's mouth shut.

#43, Ex. 105, at 2-4.

Later in the November 5, 2002, call, Hong again represented that the criminal investigation still was ongoing and again exhorted Singer to consider "the big picture:"

> HONG: Right. So now the DA wants to analyze and compare the DNA, the sperm, the DNA from the sperm on the towel and the pubic hairs.

> [SINGER]: Right, well they are gonna analyze sperm DNA, then its [sic] not water DNA [vis-à-vis the water bottle turned over after the first settlement].

> HONG: Right, but, I and I asked the detective, I go, "what is a buckle [sic] swab?" And he said, "we get a warrant and basically Mr. Angelil submits and we get a little swab and we take this DNA from inside his uh, walls of his check [sic] inside his mouth." But he, but he said, "right now, we are not even gonna do that until we get this dress coat with a, with more of the sperm on it." And of course I have been telling my client, "you know, you got to turn that over." And finally she came to me last week when you were gone and said, "Okay, you know what? I am tired of this. I'm not gonna turn that over, I'll give it to Mr. Singer, let's just wrap this up." And then she busted out the dark green underwear and I was like, "where the heck did that come from?" And uh, she said she "has that too." And I mean, basically, I just want you to look at the big picture because litigation isn't gonna resolve this matter, I think we all know that.

#43, Ex. 105, at 5-6.

Metro investigators in fact had not processed *any* of the evidence that Sung and Kwon had provided to Detective Barrett. He had submitted a request for lab analysis, but the request still was in line for processing when Metro closed the investigation. Barrett canceled the lab work request after he closed the investigation on October 17, 2002.[19]

On November 19, 2002, Allison Hart, an associate working for Singer's firm, took a call from Hong and Olsen. According to Hart's testimony, Hong stated to Hart that the detective investigating

---

[19] *Kwon Trial*: #33, Ex. 38B, at 30-33. The Court did not locate corresponding testimony at the Sung trial.

-8-

the criminal charge had given Sung until 5:00 p.m. the following day to turn over "the jacket and a dress." He stated that if Sung failed to do so "the criminal investigation would be closed for good," but if she did turn it over "that it would be out of his hands, and there would be no way to resolve the civil matter." Olsen stated that "we're at a crossroads where we have an opportunity to resolve the civil case which would result in the criminal matter also resolving, but that if we did not resolve the civil case and the criminal investigation went forward, that it would be out of his hands." Olsen indicated "that if the civil case was resolved that Ms. Sung would refuse to cooperate with the police investigating the criminal complaint."[20]

Detective Barrett had given no such extension to Sung.   On November 20, 2002, Detective Barrett sent a second certified case-closure notification letter to Sung. He sent the second letter per a request from his supervisor to send another letter that would be sent also to the suspect's attorney. He sent copies of the letter to Joseph Hong and to David Chesnoff, Angelil's criminal counsel in Las Vegas. Return receipts were received from both Sung and Hong.[21]

Also on November 20, 2002, Singer had another telephone conversation with Hong, which included the following exchange:

> [SINGER]:   So let me understand this, if we pay you money, because I'm discussing this with my client? . . . .  What's your client going to do with these items?

> [HONG]:   She's gonna give it to you.

> [SINGER]:   Otherwise she is going to turn it over to the cops?

> [HONG]:   Yeah.

> [SINGER]:   She hasn't turned it over to the cops yet?

> [HONG]:   No, we are in abeyance right now, that's basically, we are at a cross roads, that's where we are at right now.  And, what I relayed over to Allison, your associate was basically, you know, if it's gonna get done, it's gotta get done before she obviously turns it over to the detectives, because once she does that it's out of our hands, we can't say, you know what, never mind.

---

[20] *Kwon Trial*: #33, Ex. 38C, at 21-27.  *Sung Trial*: #32, Ex. 24D, at I-99-106.

[21] *Kwon*: #33, Ex. 38B, at 27-29.  *Sung*: #32, Ex. 24E, at II-51 & 54-55.  #41, Ex. 81.

1    [SINGER]:    But we thought that she had already turned over  . . . .

2    [HONG]:      She has.  She has turned over the evidence, but not, she
3                 kept, she kept the jacket and one last piece that she
                  wanted as a safe harbor for herself, but apparently the
                  detective and D.A. they want everything, so they want
4                 this jacket before they push forward and get a warrant for
                  Rene Angelil's DNA buckle [sic] swab.

5

6    #41, Ex. 75, at 1-2.[22]

7         As the conversation continued, Hong continued the charade as to a still ongoing criminal

8    investigation, and he continued to connect payment to Sung then withholding evidence that would result

9    in the closing of the criminal investigation:

10
11   [SINGER]:    And it's [the dress/jacket] preserved for, it's been 3 years
                  since then, she hasn't washed it in 3 years?

12   [HONG]:      Preserved and apparently in speaking with the detective
13                their lab can absolutely get it, it's not a problem.

     [SINGER]:    So, you have told the detectives that there is a jacket.
14
15   [HONG]:      He knows, he knows there is a jacket because when we
                  turned over the other physical evidence to him back 3 or
                  4 months ago, 6 months ago around, we also gave him a
16                videotape of all the, all the evidence that was taken. . . .

17                              . . . . .

18   [SINGER]:    Yeah, so, your client made a ridiculous demand of
                  $20,000,000.  What does your client want in order to
19                turnover, they would give us these items instead of
                  giving it [sic] over to the cops.
20
21   [HONG]:      O.K.  And here it is and I'm not going to play cat and
                  mouse with you . . . .  She said $10,000,000 and it's over.
22                That's what she told me. . . . .

                               . . . . .

23   [SINGER]:    Then if she gave him [sic] $10,000,000 bucks, they
                  would not turnover the dress, excuse me the jacket and
24                the underwear or any other physical evidence to the cops

25

26        [22]See *Kwon Trial*: #33, Ex. 38B, at 91-94.  *Sung Trial*: #32, Ex. 24D, at I-35-38.  The recording was played for
     the jury and admitted into evidence at both trials, and copies of the transcript were provided to the jury for reference
27   while they listened to the recording.  The transcript itself was not admitted into evidence.  In the present federal habeas
     matter, petitioners have presented the transcript (#40, Ex. 75) as an exhibit without challenging its accuracy.  This Court
28   accordingly has referred to the transcript with regard to the content of the conversation.

1     and everything would be over?

2     [HONG]:     It would be over.  She would give it over to, bring it here and you can leave it here or whatever and she would give it to you and basically everything is all said and done.

3

4     [SINGER]:     But how can we be certain that it's going to be done, last time she got a lot of money before and then she came back for more.

5

6     [HONG]:     Well because of this, and I told you, Number 1, the criminal side of it is going to be done, there will be no prosecution because there will be, because she is not cooperating because she has not turned over what they want. . . . .

7

8

9     #41, Ex. 75, at 3-4.

10          As the conversation continued, Hong further tied the payment of an immediate settlement in the

11     civil case to not delivering evidence to the police and thereby terminating the criminal case:

12     [SINGER]:     So they would deliver that and they would not deliver it to the cops and there would be no criminal prosecution and we would be done?

13

14

15     [HONG]:     That's right.  Because the cops will not prosecute this, this is in abeyance, they will not move forward until they get this dress.

16

17     [SINGER]:     What is the status of the criminal investigation, I don't even know what is going on because I don't do any criminal . . .

18

19     [HONG]:     Well, basically everything is ready to go, you know they had those like 13 tapes that's all been transcribed, everything is ready to go, the D.A. is ready to move forward with this, but he wants to have a loaded gun, so he wants this jacket.  Once he gets this jacket, this is what the detective has told me.  The warrant would be issued for Rene Angelil to submit to a buckle [sic] swab, which is a DNA . . . and then they were going to compare that DNA with the DNA on the jacket and the other items and if it is a match then they are going to charge him for rape.  That's how it is supposed to play out, but they are not going to move forward with that until they get the jacket.  See, that's where we are at.  So, what I am trying to tell you is if my client turns the jacket over to the detective, well, at that point, there would be no point of settling this case for Rene Angelil's part because the criminal investigation is going to move forward whether we like it or not. . . . .

20

21

22

23

24

25

26

27

28     #41, Ex. 75, at 6-7.

-11-

The November 20, 2002, conversation closed with Hong once again seeking to suggest that time was of the essence because the police were actively seeking to press the – in fact already closed – criminal investigation forward:

> [HONG]:     We are literally day to day Marty and I'm not kidding you. We are literally day to day. The detective is calling me literally everyday and saying what, Joe, where, where is this jacket, because we know, we are literally day to day right now.

#41, Ex. 75, at 9.

Detective Barrett in fact had not been calling Hong day to day in late October and November 2002, as he had closed the investigation on October 17, 2002.[23]

On December 2, 2002, Singer received a fax letter from Hong. The letter stated that "the window of opportunity to resolve the . . . matter in its *entirety* is quickly closing." The letter imposed a deadline of Thursday, December 5, 2002, to receive confirmation of Angelil's agreement to the settlement proposal. According to Singer's testimony, after receiving this letter, he retained a Las Vegas lawyer and requested that lawyer to contact Las Vegas police.[24]

On December 3, 2002, David Chesnoff, Angelil's criminal attorney, faxed and called Detective Barrett. Chesnoff stated to Barrett that he believed that the alleged victim and the victim's attorney were trying to extort Angelil. Barrett, who worked with the sexual assault detail, briefed the robbery detail. Barrett had no involvement with the extortion case investigation after that point.[25]

Singer testified that, at Metro's direction, he sought to set up a meeting attended by Kwon, Sung, Hong and Olsen that also would be attended by an undercover detective posing as a business manager for Angelil. In December 2002, Singer continued to receive letters from Hong that, *inter alia*, emphasized that time was of the essence, set impending deadlines, and then extended the deadlines.[26]

////

---

[23]*Kwon Trial*: #33, Ex. 38B, at 28 *Sung Trial*: #32, Ex. 24E, at II-52.

[24]*Kwon*: #33, Ex. 38B, at 94-95. *Sung*: #32, Ex. 24D, at I-39-42 & 74-75. #40, Ex. 62 (emphasis in original).

[25]*Kwon*: #33, Ex. 38B, at 28-29 & 36-38. *Sung*: #32, Ex. 24E, at II-52.

[26]*Kwon*: #33, Ex. 38B, at 95-99 & 106. *Sung*: #32, Ex. 24D, at I-40-45. #40, Exhs. 63-65.

1    As of December 18, 2002, a meeting had been set for Friday, December 20, 2002, at Chesnoff's

2  office in Las Vegas.  However, that same day Singer received a fax letter directly from Kwon and Sung

3  stating that they had terminated the representation by Hong and Olsen "as of October 4, 2002."  They

4  gave a contact address for Daniel Lee of Lee, Kim & Song and requested that Singer direct all further

5  communications to Lee.  The letter was admitted into evidence without defense objection.[27]

6    On December 20, 2002, Singer was fax copied with a letter from Kwon and Sung to the Lee,

7  Kim & Song firm terminating their services.  A copy of a second letter dated December 18, 2002, from

8  Hong and Olsen to the Lee, Kim & Song firm that was admitted into evidence with the December 20,

9  2002, letter vigorously disputed the assertion that their representation had been terminated on October

10  4, 2002.   These letters were admitted into evidence also without defense objection.[28]

11    On December 21, 2002, Singer received a fax letter from Hong stating that Kwon and Sung had

12  re-engaged their services and that they wished to meet and settle the matter no later than December 30,

13  2002.  The letter proposed a number of actions and commitments to be undertaken respectively by

14  Kwon and Sung, such as confidentiality by each, in exchange for a $13,500,000.00 global settlement.

15  The letter again referred to resolving the matter "in its *entirety*."[29]

16    After a series of communications, the deadline was extended to a Thursday, January 16, 2003,

17  meeting at Chesnoff's office in Las Vegas.  In one of the series of fax letters from Hong and/or Olsen,

18  they stated that "Mrs. Kwon has determined that in order to accomplish the results desired by both

19  parties, it is imperative that the settlement include Mr. Kwon."  In the final fax letter in the series

20  confirming the January 16, 2003, meeting, Hong stated that Kwon and Sung <u>"will not grant any further</u>

21  <u>extensions, *for any reason*, of their settlement offer</u>."[30]

22    On January 16, 2003, the meeting was held at Chesnoff's office.  The meeting was attended by

23  Kwon, Sung, Hong, Olsen, Singer, a Korean interpreter arranged by Singer, and Michael Wilson, an

24

25    [27]*Kwon Trial*: #33, Ex. 38B, at 99-100.  *Sung Trial*: #32, Ex. 24D, at I-45-47. #40, Exhs. 66-67.

26    [28]*Kwon Trial*: #33, Ex. 38B, at 100-02.  *Sung Trial*: #32, Ex. 24D, at I-47-48. #40, Ex. 68.

27    [29]*Kwon Trial*: #33, Ex. 38B, at 102-03.  *Sung*: #32, Ex. 24D, at I-48-51. #40, Ex. 69 (emphasis in original).

28    [30]*Kwon*: #33, Ex. 38B, at 103-07.  *Sung*: #32, Ex. 24D, at I-51-57. #40, Exhs. 70-74 (emphasis in original).

1    undercover detective posing as Angelil's business manager.  Singer repeatedly stopped the discussion

2    to ensure that the interpreter was interpreting the discussion and that Kwon and Sung understood.[31]

3         At the meeting, Hong and Olsen reiterated the key points that the (long-since-closed) criminal

4    investigation was "on hold," that the criminal case would not be pursued if Sung and Kwon did not turn

5    over the jacket/dress, that they would not do so if they settled the civil case, that they instead would turn

6    the physical evidence over to Angelil, and that Sung was insisting that Kwon be included in the

7    settlement.  It further was stated that Sung and Kwon had been planning their course of action for over

8    two years.  The meeting ended with Las Vegas police arresting Kwon and Sung.[32]

9                              ***Standard of Review on the Merits***

10        The Antiterrorism and Effective Death Penalty Act (AEDPA) imposes a "highly deferential"

11   standard for evaluating state-court rulings that is "difficult to meet" and "which demands that state-court

12   decisions be given the benefit of the doubt."  *Cullen v. Pinholster*, 131 S.Ct. 1388, 1398 (2011).  Under

13   this highly deferential standard of review, a federal court may not grant habeas relief merely because

14   it might conclude that the state court decision was incorrect.  131 S.Ct. at 1411.  Instead, under 28

15   U.S.C. § 2254(d), the court may grant relief only if the state court decision: (1) was either contrary to

16   or involved an unreasonable application of clearly established law as determined by the United States

17   Supreme Court; or (2) was based on an unreasonable determination of the facts in light of the evidence

18   presented at the state court proceeding.  131 S.Ct. at 1398-1401.

19        A state court decision is "contrary to" law clearly established by the Supreme Court only if it

20   applies a rule that contradicts the governing law set forth in Supreme Court case law or if the decision

21   _____

22   [31]*Kwon Trial*: #33, Ex. 38B, at 107-08 (Singer); #34, Ex. 38C, at 27-38 (Detective Wilson).  *Sung Trial*: #32, Ex. 24D, at I-57-59 (Singer); Ex. 24E, at II-2-29.  The transcripts are discussed in the next note.

23   [32]See, primarily, #43, Ex. 107.  The Court is not persuaded by petitioners' argument in the federal reply that the

24   transcript of the meeting did not support an inference of guilt.  As background, at Sung's October 2004 trial, the State introduced a copy of a transcript of the meeting that did not include translation of any Korean discussion but that was

25   accurate as to the English discussion, as State Exhibit 25.  The defense introduced a copy of a transcript that included a translation of the Korean discussion, as Defense Exhibit G.  It was undisputed that the English portions of Defense

26   Exhibit G were from an earlier, incomplete and inaccurate transcript.  See #32, Ex. 24E-1, at II-61-67; id., Ex. 24F-1, at 3A-40-43; #41, Ex. 79 (State Exhibit 25); #42, Ex. 91 (Defense Exhibit G); see also #34, Ex. 49 (State Exhibit 25).  At

27   Kwon's March 2005 trial, the State introduced without objection what was described as a "consolidated" transcript -- one that apparently contained an accurate and complete transcription of the English discussion along with an accurate and

28   complete translation of Korean discussion.  See #34, Ex. 38C, at III-31-35; #43, Ex. 107 (State Exhibit 24A).

confronts a set of facts that are materially indistinguishable from a Supreme Court decision and nevertheless arrives at a different result. *E.g.*, *Mitchell v. Esparza*, 540 U.S. 12, 15-16, 124 S.Ct. 7, 10, 157 L.Ed.2d 263 (2003). A state court decision is not contrary to established federal law merely because it does not cite the Supreme Court's opinions. *Id.* Indeed, the Supreme Court has held that a state court need not even be aware of its precedents, so long as neither the reasoning nor the result of its decision contradicts them. *Id.* Moreover, "[a] federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme] Court is, at best, ambiguous." 540 U.S. at 16, 124 S.Ct. at 11. For, at bottom, a decision that does not conflict with the reasoning or holdings of Supreme Court precedent is not contrary to clearly established federal law.

A state court decision constitutes an "unreasonable application" of clearly established federal law only if it is demonstrated that the state court's application of Supreme Court precedent to the facts of the case was not only incorrect but "objectively unreasonable." *E.g., Mitchell*, 540 U.S. at 18, 124 S.Ct. at 12; *Davis v. Woodford*, 384 F.3d 628, 638 (9th Cir. 2004).

To the extent that the state court's factual findings are challenged, the "unreasonable determination of fact" clause of Section 2254(d)(2) controls on federal habeas review. *E.g., Lambert v. Blodgett*, 393 F.3d 943, 972 (9th Cir. 2004). This clause requires that the federal courts "must be particularly deferential" to state court factual determinations. *Id.* The governing standard is not satisfied by a showing merely that the state court finding was "clearly erroneous." 393 F.3d at 973. Rather, AEDPA requires substantially more deference:

> . . . . [I]n concluding that a state-court finding is unsupported by substantial evidence in the state-court record, it is not enough that we would reverse in similar circumstances if this were an appeal from a district court decision. Rather, we must be convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record.

*Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004); *see also Lambert*, 393 F.3d at 972.

Under 28 U.S.C. § 2254(e)(1), state court factual findings are presumed to be correct unless rebutted by clear and convincing evidence.

The petitioner bears the burden of proving by a preponderance of the evidence that he is entitled to habeas relief. *Pinholster*, 131 S.Ct. at 1398.

-15-

1                                          ***Discussion***

2        ***Quashing of Rene Angelil Subpoena (Kwon Ground 1)***

3           Kwon alleges that he was denied rights to due process, to confront and cross-examine witnesses

4 against him, to call witnesses at trial and to present a defense under the Fifth, Sixth, and Fourteenth

5 Amendments when the state trial court quashed his subpoena of Rene Angelil.

6           Under N.R.S. 174.345(1), "service of a subpoena must be made by delivering a copy thereof to

7 the person named," *i.e.*, personal service. N.R.S. 174.315(2)(b) further states that "[w]itnesses already

8 subpoenaed who are required to reappear in any Justice Court at any time the court is to reconvene in

9 the same case within 60 days, and the time may be extended beyond 60 days upon good cause being

10 shown for its extension."

11           On December 21, 2004, defense counsel's process server, Mark Henery, sought to serve a

12 subpoena for Rene Angelil to testify at a trial scheduled for January 10, 2005.  Henery went to the Lake

13 Las Vegas development where Angelil lived and was escorted by security for the overall development

14 to Angelil's home.  Angelil's security guard advised Henery that Angelil was not at home.  Henery

15 "served" Angelil's security guard, who "accepted" the service.  It is undisputed that defense counsel

16 never secured service of a subpoena – for any trial setting – personally on Rene Angelil.[33]

17           The January 10, 2005, trial setting was continued to March 15, 2005.  It is undisputed that no

18 request was made to continue the subpoenas from the January 10, 2005, trial setting.  As no request was

19 made to continue the subpoenas, no request was made to extend a 60-day period with respect to the

20 the March 15, 2005, trial setting.[34]

21           At a February 18, 2005, hearing on pretrial motions, Kwon's counsel brought up a "matter of

22 housekeeping" in which she sought to argue the relevancy of Angelil's testimony.  The transcript of the

23 hearing reflects that only counsel for the State and the defense had entered an appearance at the

24 proceeding, without any appearance by counsel for Angelil having been entered.  The State maintained

25 that testimony from Angelil would be irrelevant because Kwon and Sung had communicated

26

---

27       [33]See #33, Ex. 38B, at 80-84.

28       [34]See *id.*, at 89-90.

exclusively with his counsel, Martin Singer.  After hearing argument from the State and defense, the trial judge stated that she did not believe that his testimony would be relevant and quashed the subpoena.  After defense counsel pointed out that there was no motion to quash before the court, the trial judge rescinded the order quashing the subpoena.[35]

When the case came on for trial on Tuesday, March 15, 2005, counsel for Angelil, Richard Schonfeld, appeared and challenged the subpoena.  The trial judge had the jury venire standing by, and she had not yet commenced voir dire.  The judge told Schonfeld that if he filed and served a written motion it would be heard the next day.  Schonfeld filed a written motion to quash that afternoon.[36]

The next afternoon, on Wednesday, March 16, 2005, the trial judge heard the motion to quash. Schonfeld argued that Angelil had not been personally served, that he had not been subpoenaed for the March 15, 2005, trial date, and that the subpoena in any event would be untimely for that trial date under the 60-day rule of N.R.S. 174.315(2)(b).  The State further argued that Angelil's testimony would not be relevant, along the lines previously discussed.  After hearing argument and testimony regarding how the subpoena was purportedly served, the trial judge ruled: (1) that the subpoena had not been continued to the March 15, 2005, trial date and was untimely; (2) that the subpoena had not been personally served; and (3) that Angelil's testimony would be irrelevant.[37]

The State rested the next afternoon, Thursday, March 17, 2005, only one day later.  The defense completed its testimony and rested the following morning, on Friday, March 18, 2005.[38]

On direct appeal, the Supreme Court of Nevada rejected the corresponding claim presented to that court on the following grounds:

> Kwon argues that the district court erroneously prohibited him from calling Angelil as a witness.  We disagree.  The record reveals that the district court quashed Kwon's subpoena to call Angelil to testify partially on the basis that it was not timely and properly served.  We

---

[35] #33, Ex. 36, at 10-13.

[36] #33, Ex. 37; *id.*, Ex. 38A, at 13-16.

[37] #33, Ex. 38B, at 72-90.

[38] See #33, Ex. 38B, at 197 (time for reconvening); #34, Ex. 38C, at 54 & 91 (State rests; time for reconvening); #34, Ex. 38D, at 31 (defense rests; closing arguments to run through the lunch hour).

-17-

1    conclude that Kwon has failed to demonstrate that the district court
2    abused its discretion by quashing his subpoena of Angelil on this
     basis.[FN29]

3            [FN29] We note, however, that the district court may
4            have erroneously concluded that Angelil's testimony was
             not relevant.

5    #34, Ex. 45, at 13-14.

6            Petitioner has not carried his burden of demonstrating that the state supreme court's rejection

7    of his claim was either contrary to or an unreasonable application of clearly established federal law.

8            The Nevada Supreme Court is the final arbiter of Nevada state law.  The state high court's

9    determination that the Angelil subpoena was properly quashed under Nevada state law as untimely and

10   for lack of proper service is the end of the matter in that regard.[39]

11           Petitioner urges that the trial court's alternative relevancy holding "of course, precluded Mr.

12   Kwon from reissuing a 'timely' subpoena and attempting again to serve him personally."[40]  Such a

13   strained argument hardly demonstrates that the Nevada Supreme Court's rejection of his claim on

14   exclusively state law grounds was contrary to or an objectively unreasonable application of clearly

15   established federal law as determined by the United States Supreme Court.

16           Kwon has not come forward with any apposite case authority from the United States Supreme

17   Court holding that a criminal defendant has a right "to have compulsory process for obtaining witnesses

18   in his favor" even where he has failed to properly effect such compulsory process.  That in essence is

19   what Kwon seeks here – constitutionally required enforcement of *invalid* compulsory process on the

20   basis of the alleged relevancy of the witness' testimony.  If petitioner did not effect valid compulsory

21   process of the witness in the first instance, the alleged relevancy of his testimony becomes immaterial --

22   as do rights to call and cross-examine the witness and to present a defense based upon his testimony.

23

24           [39]Petitioner urges, *inter alia,* that Angelil was aware of the subpoena and the date of the trial. #39, at 8.  Trial
25   subpoenas, however, become enforceable by proper service, not by alleged awareness.  The critical point remains that
     defense counsel did not properly serve Angelil with the subpoena and did not seek to serve a subpoena that was timely
26   as to the March 15, 2005, trial setting.  Angelil protected her right to timely personal service, and it was incumbent upon
     defense counsel to properly and timely subpoena her witnesses.  This Court cannot – and will not – look behind the
27   ruling by the highest court in Nevada on that point, which is exclusively one of Nevada state law.

28           [40]#39, at 8.

                                                    -18-

1    Defense counsel was not precluded from properly serving a subpoena on Angelil by any ruling

2  of the trial court.  Defense counsel could have properly served the subpoena in the first instance and

3  eliminated the alternative state law grounds for quashing the subpoena.  And, if she wanted to make a

4  record where only the federal law issue remained, she could have sought to properly serve a new

5  subpoena for that purpose.  As a practical matter, time, not the trial court's alternative relevancy ruling,

6  is what precluded counsel from overcoming her initial failure to properly serve the subpoena in the first

7  instance.

8    The federal case authority upon which petitioner relies is inapposite.  The cited cases address

9  circumstances where the defense is seeking to present testimony via either valid compulsory process

10  or the voluntary attendance of a witness.  Neither circumstance is applicable here.  It simply is axiomatic

11  that a defendant first must secure the attendance of the witness before the issues addressed in the cited

12  cases become pertinent.

13    Absent apposite United States Supreme Court authority overcoming defense counsel's failure

14  to properly serve the subpoena, petitioner cannot carry his burden of proof under the "highly

15  deferential" standard of review that applies under the AEDPA.

16    Kwon's Ground 1 therefore does not provide a basis for federal habeas relief.[41]

17  ***Alleged Brady Violation as to Martin Singer File (Kwon Ground 2 & Sung Ground 3(B))***

18    Kwon and Sung allege that they were denied due process of law in violation of the Fifth and

19  Fourteenth Amendments when the state district court did not order private attorney Martin Singer to

20  produce his file on his client, Rene Angelil.

21  _____

22    [41]The Court thus does not reach petitioner's relevancy arguments.  The Court notes -- purely in passing -- that

23  petitioner's references to Angelil as the "victim" are not quite accurate in the context of the only crime for which he still
    stands convicted, witness solicitation of a bribe.  Kwon does not stand convicted of extortion or conspiracy to commit

24  extortion.  The Supreme Court of Nevada noted the *possible* error of the trial court's alternative relevancy holding in a
    context in which the extortion and conspiracy charges were subject to possible retrial on remand.

25    The Court further notes that no argument as to procedural default has been raised herein.  For some federal

26  constitutional claims, adequate preservation of the necessary prerequisites for the federal claim in the state courts is
    inherent in the claim even without regard to the procedural default doctrine.  *Cf. Haney v. Adams*, 641 F.3d 1168 (9th

27  Cir. 2011)(contemporaneous objection is an inherent fundamental requirement for preserving a federal constitutional
    *Batson* claim even without regard to the procedural default doctrine, such that a state supreme court's rejection of such a

28  claim in the absence of a contemporaneous objection was not contrary to federal law).

-19-

1    The Supreme Court of Nevada rejected the  corresponding claim presented to that court on the

2    following grounds:

4            Sung and Kwon argue that the district court's refusal to order
     Singer to give them a copy of his client file on Angelil violated <u>Brady v.</u>
     <u>Maryland</u>.[FN18]  We disagree.  The proscriptions of <u>Brady</u> apply only
5    to evidence withheld by the State.[FN19]  <u>Brady</u> does not apply to
     evidence in possession of a private witness, such as Singer.  Although
6    Sung and Kwon assert that Singer was a governmental actor to which
     <u>Brady</u> should apply, they have failed to provide any cogent argument
7    supporting this assertion.  We conclude that Sung and Kwon have failed
     to demonstrate that the district court improperly denied their request and
8    violated <u>Brady</u>.

9            [FN18]  373 U.S. 83 (1963).

10           [FN18] <u>See State v. Bennett</u>, 119 Nev. 589, 599, 81 P.3d
     1, 8 (2003)(citing <u>Mazzan v. Warden</u>, 116 Nev. 48, 67,
11   993 P.2d 25, 37 (2000)).

12   #34, Ex. 45, at 9.

13   Petitioners have failed to demonstrate that the state supreme court's rejection of their *Brady*

14   claim was either contrary to or an unreasonable application of clearly established federal law as

15   determined by the United States Supreme Court.

16   Petitioners have not cited any apposite Supreme Court authority establishing that a state district

17   court can – much less must – compel a private attorney who is a complaining witness and who was used

18   by the police in a sting operation must turn over his client's files pursuant to *Brady*, on the premise that

19   the attorney is a "state actor."  Petitioners cite only the most general – and inapposite – case authority,

20   such as cases holding that a civil attorney using court process to strike jurors in a racially discriminatory

21   manner engages in state action. [42] The Supreme Court of Nevada clearly was not required to accept the

22   novel proposition advanced by petitioners based on such inapposite authority.  Even on a *de novo*

23   review, the strained argument would face a steep uphill struggle.

24   Federal habeas review does not constitute an in effect second direct appeal where a federal

25   district court reconsiders the state courts' rejection of a petitioner's constitutional claims *de novo*.

26   Rather, as the Supreme Court repeatedly has emphasized:

28   [42] *See Edmonson v. Leesville Concrete Co., Inc.*, 500 U.S. 614, 621-22, 111 S.Ct. 2077, 2082-81, 114 L.Ed.2d
     660 (1991).

-20-

1

2

3

4

5

6

7

     A state court's determination that a claim lacks merit precludes federal habeas relief so long as "fairminded jurists could disagree" on the correctness of the state court's decision. *Yarborough v. Alvarado*, 541 U.S. 652, 664, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004). And as this Court has explained, "[E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Ibid.* "[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court." *Knowles v. Mirzayance*, 556 U.S. ——, ——, 129 S.Ct. 1411, 1413–14, 173 L.Ed.2d 251 (2009)(internal quotation marks omitted).

8

     . . . . .

9

10

11

    . . . . It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable. See [*Lockyer v. Andrade*, 538 U.S. 63, 75, 123 S.Ct. 1166, 1174-75, 155 L.Ed.2d 144 (2003).

12

13

14

15

16

17

18

19

20

     If this standard is difficult to meet, that is because it was meant to be. As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings. *Cf. Felker v. Turpin*, 518 U.S. 651, 664, 116 S.Ct. 2333, 135 L.Ed.2d 827 (1996) (discussing AEDPA's "modified res judicata rule" under § 2244). It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents. It goes no farther. Section 2254(d) reflects the view that habeas corpus is a "guard against extreme malfunctions in the state criminal justice systems," not a substitute for ordinary error correction through appeal. *Jackson v. Virginia*, 443 U.S. 307, 332, n. 5, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (Stevens, J., concurring in judgment). As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

21

*Harrington v. Richter*, ___ U.S. ___, 131 S.Ct. 770, 786-87, 178 L.Ed.2d 624 (2011).

22

    Petitioners seek to have this Court substitute a different conclusion for that reached by the

23

Supreme Court of Nevada on the federal constitutional claim based upon the most general of case

24

authorities and without any specific apposite holdings by the United States Supreme Court. Petitioners

25

do not cite a single apposite Supreme Court decision holding in a criminal case that a state district court

26

violates *Brady* when it does not order a private complaining witness to produce materials. Petitioners

27

clearly have failed to demonstrate a basis for relief under the AEDPA.

28

    ////

1    Kwon's Ground 2 and Sung's Ground 3(B) therefore do not provide a basis for federal habeas

2  relief.[43]

3    ***Hong and Olsen Coconspirator Statements (Kwon Ground 3 & Sung Ground 2(A))***

4    Kwon and Sung allege that they were denied rights to due process and to confront and cross-

5  examine witnesses when the out-of-court statements of their civil attorneys, Joseph Hong and Michael

6  Olsen, were admitted as coconspirator statements.  The statements include letters to Martin Singer,

7  telephone conversations recorded by Singer or his staff, and statements at the January 2003 meeting.

8    The Supreme Court of Nevada rejected the  corresponding claim presented to that court on the

9  following grounds:

10    First, Sung and Kwon argue that the district court improperly
      admitted into evidence statements attributed to their former counsel,
11    Joseph Hong and Michael Olsen. Hong and Olsen were retained by Sung
      and Kwon as counsel to represent them in pursing their claims against
12    Angelil. The statements were contained in faxed documents, letters, and
      transcripts of telephone conversations and meetings apparently dating
13    between March 2002 and January 2003. Sung and Kwon contend that
      admission of these statements at their trials violated the rule against
14    hearsay and their Sixth Amendment right to confrontation pursuant to
      <u>Crawford v. Washington</u>.[FN10] We disagree.

15

16    Initially, we note that Sung and Kwon only provide this court
      with general references to exhibits in their joint appendix and broadly
17    assert this error. Nevertheless, we have reviewed the statements at issue
      and conclude that they were properly admitted as non-hearsay.

18    NRS 51.035(3)(d) provides that a statement is not hearsay if it is
      offered against a party and it is made by "his agent or servant concerning
19    a matter within the scope of his agency or employment . . . before the
      termination of the relationship." And NRS 51.035(c) provides that
20    statements are also not hearsay if they are made "by a person authorized
      by him to make a statement concerning the subject."

21

22    Here, there is conflicting evidence as to when Kwon and Sung
      terminated the attorney-client relationship with Hong and Olsen. Some

23  _____

24    [43]The Court further notes in passing that it is subject to substantial question whether petitioners in any event
    satisfied the requirements for demonstrating materiality under *Brady*.  The mere possibility that undisclosed material
25  might have helped the defense, or might have affected the outcome, is insufficient to establish materiality in the required
    constitutional sense.  *United States v. Agurs*, 427 U.S. 97, 109-10, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1972).  Petitioners
26  argue the matter almost as if they were arguing a civil discovery issue under a relevancy standard.  *Brady* clearly does
    not create a constitutionally-based right of general discovery of allegedly relevant evidence in a criminal case.  *E.g.,*
27  *Weatherford v. Bursey*, 429 U.S. 545, 559, 97 S.Ct. 837, 846, 51 L.Ed.2d 30 (1977).  The record presented does not
    reflect why petitioners did not instead simply timely direct a subpoena duces tecum directly to Singer seeking production
28  of the file, subject to whatever claims of privilege Singer then might interpose on behalf of his client.

-22-

documents show that Kwon and Sung believed that they terminated their relationship with Hong and Olsen in October 2002. Other documents show that Hong and Olsen believed their relationship was only briefly terminated in December 2002. We are unable to resolve this factual conflict, but note that statements made by Hong and Olsen during the attorney-client relationship were admissible as non-hearsay under NRS 51.035(3)(d) and NRS 51.035(c).

Nevertheless, the statements made by Hong and Olsen were admissible as non-hearsay because they were made in the course and in furtherance of a conspiracy pursuant to NRS 51.035(3)(e). To be admissible under this rule, "the existence of a conspiracy must be established by independent evidence, and the statement must have been made during the course of and in furtherance of the conspiracy."[FN 11] According to the State, Hong and Olsen remain "unindicted co-conspirators. " Evidence in the form of recorded audio and videotape of a January 2003 meeting where Sung and Kwon were present established the existence of the conspiracy independently of the statements attributed to Hong and Olsen. We conclude that Sung and Kwon have failed to demonstrate that the district court committed manifest error by admitting Hong's and Olsen's statements. Because the statements were nontestimonial in nature ,[FN12] we conclude further that <u>Crawford</u> does not apply,[FN13] and Sung and Kwon were not denied their right to confrontation.[FN 14]

[FN10]  541 U.S. 36 (2004).

[FN11] <u>Wood v. State</u>, 115 Nev. 344, 349, 990 P.3d 786, 789 (1999).

[FN12] <u>See Flores v. State</u>, 121 Nev. 706, 714, 120 P.3d 1170, 1177 (2005); <u>Crawford</u>, 541 U. S. at 68.

[FN13] We also reject Sung and Kwon's argument that NRS 51.035 is unconstitutional pursuant to <u>Crawford</u>.

[FN14] Hong and Olsen invoked their Fifth Amendment right against self-incrimination and did not testify. Sung and Kwon have not cited to any authority supporting their assertion that it was error for Hong and Olsen to invoke this right outside the jury's presence.

#34, Ex. 45, at 4-6.

The state supreme court's rejection of this claim was neither contrary to nor an unreasonable application of clearly established federal law as determined by the United States Supreme Court.

In *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), the United States Supreme Court held that admission of an out-of-court "testimonial" statement by a witness, is barred by the Confrontation Clause of the Sixth Amendment unless the witness is unavailable and the

defendant had a prior opportunity to cross-examine the witness. *See* 541 U.S. at 52, 59 & 68-69, 124 S.Ct. at 1364, 1369 & 1374. However, quite clearly, "not all hearsay implicates the Sixth Amendment's core concerns" under *Crawford*. 541 U.S. at 51, 124 S.Ct. at 1364. Sixth Amendment protections instead apply to out-of-court statements that were "testimonial" in nature, which extends to "pretrial statements that declarants would reasonably expect to be used prosecutorially." 541 U.S. at 52, 124 S.Ct. at 1364. Statements knowingly given to interrogating police officers in response to structured police questioning qualified as "testimonial" "under any conceivable definition." 541 U.S. at 52-53 & n.4, 124 S.Ct. at 1364-65 & n.4. In contrast, the *Crawford* Court identified statements made in furtherance of a conspiracy as "statements that by their nature [are] not testimonial." 541 U.S. at 56, 124 S.Ct. at 1367.

Petitioners contend: (1) that the Hong and Olsen statements constituted "testimonial statements" for purposes of *Crawford* because they were made to Martin Singer allegedly as a state actor; (2) that the State never presented evidence independent of the statements to establish that there was a conspiracy between Hong and Olsen and petitioners; (3) the state district court did not make findings required for the introduction of coconspirator statements; (4) that not all of the statements were made within the time frame of the conspiracy alleged in the indictment or during the existence of the attorney-client relationship; and (5) in the reply, that, following upon the reversal of the extortion and conspiracy counts "[r]espondents cite no authority for the proposition that hearsay testimony from a non-testifying co-conspirator in a case where a conspiracy is not charged is admissible."[44]

On the first point, petitioners acknowledge that "[g]enerally, statements made by a co-conspirator that qualify for admission [under federal and state evidence rules] may be admitted without violating the confrontation clause under *Crawford*." Petitioners urge, however, that "the telephone recordings are not testimonial because they were procured by Martin Singer for the purpose of this criminal case, and for litigation."[45] Petitioners pursue the same argument discussed, *supra*, on petitioners' *Brady* claim that Singer was a state actor .

---

[44]#39, at 21.

[45]*Id.*

-24-

1    The Ninth Circuit and other federal circuits have recognized that *Crawford* suggests that the

2    determinative factor in determining whether a declarant's out-of-court statements are "testimonial" is

3    the declarant's awareness or expectation that the statements later may be used at trial.  *United States*

4    *v. Larson*, 460 F.3d 1200, 1213 (9th Cir. 2006), *pertinent portion of panel opinion adopted on en banc*

5    *review*, *United States v. Larson*, 495 F.3d 1094, 1099 n.4 (9th Cir. 2007)(*en banc*).

6    Applying this focus, the Second, Third, Sixth,  Seventh, Tenth and Eleventh Circuits have held

7    in published decisions following *Crawford* that a declarant's statements to a private party informant are

8    not testimonial because the declarant is not making the statements with an expectation that the

9    statements later may be used at trial.[46]  The Sixth Circuit additionally has held that statements made

10   *directly to an undercover officer* similarly are not testimonial because, again, the declarant is not

11   making the statements with an expectation that the statements may later be used at trial.[47]  In the present

12   case, the Supreme Court of Nevada held, *inter alia*, that "[b]ecause the statements were nontestimonial

13   in nature, we conclude further that <u>Crawford</u> does not apply."  If numerous federal circuits have held

14   that statements made to an undercover informant are not testimonial, then, clearly, the Nevada Supreme

15   Court's holding that the statements made to Singer prior to and during the sting operation were not

16   testimonial was not an unreasonable application of *Crawford*.

17   Indeed, given the lower federal court authority holding that a statement made unwittingly

18   directly to an undercover officer is not testimonial, petitioner's entire "state actor" theory cannot

19   _____

20   [46] *See,e.g., United States v. Smalls*, 605 F.3d 765, 778-80 (10th Cir. 2010)(statement to prison informant who
     was wearing a recording device); *United States v. Johnson*, 581 F.3d 320, 323-25 (6th Cir. 2009), *cert. denied*, ___ U.S.

21   ___, 130 S.Ct. 3409, 177 L.Ed.2d 326 (2010)(statement to prison informant wearing a recording device); *United States
     v. Watson*, 525 F.3d 583, 589 (7th Cir. 2008)(statement to confidential informant recorded by the government); *United*

22   *States v. Underwood*, 446 F.3d 1340, 1346-48 (11th Cir. 2006)(recorded statements to confidential informant); *United
     States v. Johnson*, 440 F.3d 832, 843 (6th Cir. 2006)(statement to an acquaintance cooperating with law enforcement);

23   *United States v. Hendricks*, 395 F.3d 173, 182 n.9, 184 (3rd Cir. 2005)(statement made to a confidential informant that is
     recorded by the government); *United States v. Saget*, 377 F.3d 223, 229 (2d Cir. 2004)(same); *see also Bourjily v.*

24   *United States*, 483 U.S. 171, 181-84, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987)(under pre-*Crawford* test, statement made
     to government informant); *Davis v. Washington*, 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006)(harmonizing

25   *Bourjily* with *Crawford* on the basis that the statement made to a government informant was "clearly nontestimonial"

26   under *Crawford*).

27   [47] *See United States v. Mooneyhan*, 473 F.3d 280, 286-87 (6th Cir. 2007)(coconspirator statement to undercover
     officer); *see also United States v. Vasquez*, 2007 WL 2033354 (5th Cir. 2007)(statement to undercover agent recorded by

28   the government)(unpublished decision).

succeed on deferential AEDPA review.  An undercover officer undeniably is a state actor.  If a statement made unwittingly to an undercover police officer is not testimonial, a statement to a private citizen who ultimately cooperates with an undercover officer also is not testimonial.  Whether a statement was made to a "state actor" simply is not an outcome determinative inquiry under *Crawford*.[48]

This Court accordingly holds that the Nevada Supreme Court's conclusion that the Hong and Olsen statements were not testimonial was neither contrary to nor an unreasonable application of clearly established federal law as determined by the United States Supreme Court.  This holding ends the Sixth Amendment inquiry in this Court.  *Crawford* indisputably overruled the prior decision in *Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980).  *See,e.g., Whorton v. Bockting*, 549 U.S. 406, 413, 127 S.Ct. 1173, 1179, 167 L.Ed.2d 1 (2007).  Under *Roberts*, the issue of whether admission of an out-of-court statement offended the Sixth Amendment turned upon whether the statement fell within a firmly rooted hearsay exception or bore other particularized guarantees of reliability and trustworthiness.  *See,e.g., Crawford*, 541 U.S. at 42, 124 S.Ct. at 1359.  After *Crawford*, such an analysis has no pertinence to the Sixth Amendment inquiry.  If the statements are not testimonial, then the reviewing court has no need to determine whether the statements fit within the technical contours of a recognized hearsay evidentiary rule, such as the rule allowing the admission of coconspirator statements.  *See Bockting*, 549 U.S. at 420, 127 S.Ct. at 1183; *Larson*, 495 F.3d at 1099 n.4 (*en banc*).

This Court thus need not reach any of petitioners' remaining points, which all in truth pertain to the particulars of applying Nevada state evidentiary law governing the admission of out-of-court statements.  The conclusion that the state supreme court's holding that the statements were not testimonial was not an unreasonable application of *Crawford* ends the inquiry insofar as petitioners' Sixth Amendment claims are concerned.[49]

---

[48]Petitioner's argument that the statements were testimonial because Singer allegedly was collecting evidence for civil litigation strays even wider of the mark.  Under *Crawford*, the testimonial nature of the statements is directed to their anticipated use for *criminal* proceedings.

[49]The Court notes the following, in passing, as to the remaining points that are directed more to state law issues.

First, petitioners' participation in the January 16, 2003, meeting and their own statements there provide ample independent evidence of the existence of the conspiracy separate and apart from the statements by Hong and Olsen.

(continued...)

1          Kwon's Ground 3 and Sung's Ground 2(A) accordingly do not provide a basis for federal habeas

2    relief.

3    _____

4      [49](...continued)

5         Second, petitioners do not cite apposite state authority supporting the proposition that the state district court failed to make required findings for the introduction of the coconspirator statements. Petitioners infer from the broad premise that N.R.S. 51.035(3)(e) "mirrors" Federal Rule of Evidence 801(d)(2)(E) the specific conclusion that the trial court findings required under federal criminal caselaw applies fully in the Nevada state courts. Such a conclusion hardly follows inexorably from the premise. Many state evidentiary provisions across the country track federal evidentiary rules without importing every jot and title of federal case law applying the federal provisions. In any event, *federal* case authority holds that implicit findings may suffice. *See,e.g., United States v. Lutz*, 621 F.2d 940, 947 (9th Cir. 1980).

     Third, petitioners urge that not all of the statements were made within the time frame of the conspiracy alleged in the indictment or during the existence of the attorney-client relationship. Petitioners rely upon the statement of Kwon and Sung in their December 18, 2002, letter that the representation by Hong and Olsen had been terminated on October 4, 2002. Petitioners further rely upon the allegation in the indictment that the defendants conspired to commit extortion on or between November 2002 and January 16, 2003. Petitioners cite no apposite Nevada state authority holding that admission of coconspirator statements found to satisfy N.R.S. 51.035(3)(3) necessarily is cabined by the indictment. *Cf. Carr v. State*, 96 Nev. 238, 239, 607 P.2d 114, 115-16 (1980)(admissibility of coconspirator statement is not predicated upon a conspiracy charge against the defendant). Further, petitioners' own self-serving declaration – after the alleged fact – that the representation was terminated on October 4, 2002, hardly establishes such a fact beyond peradventure. In any event, even if the Court were to assume that the Hong and Olsen statements to Singer made from October 5, 2002, through October 30, 2002, were not admissible either as a coconspirator statement or as an agent's statement, the prosecution in the two cases hardly turned upon the contents of the communications from Hong and Olsen to Singer during this particular time period. See text, *supra*, at 5-6. Petitioners arguably were not substantially prejudiced by any *arguendo* state evidentiary law error in the admission of these statements to Singer in comparison to the remaining statements before and after this particular period. (As discussed in the text, the mere introduction of out-of-court statements does not implicate the Sixth Amendment unless they are "testimonial.") If, on the other hand, it were found that the attorney-client relationship existed during this October 5, 2002, through October 30, 2002, period – despite the after-the-fact statement to the contrary by Kwon and Sung – there would be no state law evidentiary issue at all.

     Fourth, petitioners' suggestion, for the first time in the federal reply (#39, at 21), that they were not "charged" with a conspiracy simply is incorrect. They were charged with and convicted of extortion and conspiracy to commit extortion, but the convictions on those charges were reversed for trial court error due to the court's failure to allow petitioners to pursue a particular defense to the extortion charges. See #34, Ex. 45, at 1-3. The State ultimately opted not to pursue a retrial on the extortion and conspiracy charges on remand. Petitioners cite no apposite authority holding that reversal of a conspiracy conviction for trial court error as to that charge subject to retrial renders otherwise properly-admitted coconspirator statements inadmissible vis-à-vis other counts in an indictment. (The Court notes in passing that the indictment actually charged petitioners with conspiracy "to commit the crimes of Extortion *and Witness Soliciting a Bribe*." #31, Ex. 1, at 2 (emphasis added).) Indeed, petitioners cite no apposite authority holding that the admissibility of coconspirator statements is contingent as to other charges upon a defendant later being convicted on the conspiracy charge. *Cf. United States v. Peralta*, 941 F.2d 1003, 1007 (9th Cir. 1991)(acquittal on conspiracy charge did not render statements admitted as coconspirator statements inadmissible). In all events, petitioners' argument -- which essentially equates the reversal of a conspiracy conviction subject to retrial with never having been "charged" with a conspiracy -- is far from persuasive.

     The Nevada Supreme Court is the final arbiter of whether the statements were admissible under Nevada state law. Even if petitioners, *arguendo*, could demonstrate state law error, which is a highly doubtful proposition in the first instance, any such alleged state error clearly would not present a deprivation of federal due process in this case.

***Disallowance of Rebuttal Testimony by Law Professor on Ethics (Sung Ground 2(B))***

Sung alleges in her federal petition that "it was error" for the state trial court to disallow expert testimony by a law professor who allegedly would have testified that the statements made by Hong and Olsen during the settlement negotiations were well within the confines of current legal and ethical guidelines for the settlement of civil actions. In the federal reply, she urges that she was denied her right to present a defense in violation of the Fifth Amendment by the exclusion of the professor's testimony and report.

At some point in the trial proceedings, Sung tendered a February 14, 2003, report by Jeffrey W. Stempel, a Professor of Law at the William S. Boyd School of Law, University of Nevada Las Vegas. Stempel prepared the report as an expert hired by Hong and Olsen in efforts to avoid being prosecuted by Las Vegas authorities. The report refers generally to the materials reviewed by Professor Stempel, but the report refers to a specific listing of the materials reviewed at the end of the report that are not included in the record in this Court. Stempel reviewed unspecified (at least in this Court) "correspondence concerning the representation," pleadings in the civil litigation, the prior settlement documents, and the recording of the January 16, 2003, meeting that immediately preceded the arrest of Kwon and Sung. The report did not affirmatively reflect, at least based upon the record presented in this Court, whether or not Professor Stempel had reviewed the entirety of the evidence canvassed in the text, *supra*, at 2-14. The report reflected that Stempel was willing to reconsider his assessment of the situation based upon review of additional information and that "[c]onsequently, this Report does not purport to be my 'last word' on the matter."[50]

Professor Stempel provided, *inter alia*, the following opinion:

> It is my assessment that neither Mr. Hong nor Mr. Olsen engaged in any improper conduct during the course of their representation of the Kwons. . . . . In addition, there is nothing improper about attorneys such as Messrs. Hong and Olsen referring to criminal matters connected with civil litigation and offering as part of a settlement to deliver an opponent materials that might be of relevance to a criminal inquiry – at least where the material in question is not subject to an outstanding subpoena or is otherwise not the subject of ongoing investigative efforts. In short, both

---

[50]#41, Ex. 82, at 2.

> Mr. Hong and Mr. Olsen appear to have conducted themselves ethically
> – far more ethically than other lawyers involved in the ongoing Kwon-
> Angelil saga [referring to Singer and Chesnoff].

#41, Ex. 82, at 5.

Professor Stempel based his opinion, in part, on the fact that the American Bar Association (ABA) Model Rules of Professional Conduct, which had been adopted in substantial part by the Supreme Court of Nevada, did not carry forward a prior provision of the predecessor ABA Code of Professional Responsibility that explicitly had barred threats of criminal prosecution during civil settlement negotiations.[51]

The ABA Formal Opinion upon which Stempel relied, however, Formal Opinion 92-363, expressly noted that "'extortionate, fraudulent, or otherwise abusive threats were covered by other, more general prohibitions in the Model Rules and thus . . . there was no need to outlaw such threats specifically.'"[52]

One such rule, Rule 8.4(b), which was adopted by the Supreme Court of Nevada, provides that it shall be professional misconduct for a lawyer to "[c]ommit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects."  Formal Opinion 92-363 expressly stated:

> If a lawyer's conduct is extortionate or compounding a crime
> under the criminal law of a given jurisdiction, that conduct also violates
> Rule 8.4(b).  It is beyond the scope of the Committee's jurisdiction to
> define extortionate conduct [but noting that the Model Penal Code did
> not criminalize threats of prosecution in related cases].

Lawyer's Manual, at 22.[53]

/ / / /

---

[51] See #41, Ex. 82, at 7-9.

[52] Opinion 92-363, ABA/BNA Lawyers' Manual on Professional Conduct: Ethics Opinions 1991-1994, at 21 (1996)[hereafter "Lawyer's Manual"].

[53] Another Rule, Rule 4.1, prohibits a lawyer from knowingly making a false statement of material fact to a third person.  Formal Opinion 92-363 also referred to this rule as one that could be violated in the course of threatening criminal prosecution.  Lawyer's Manual, at 22.  The evidence canvassed previously herein reflects that Hong and Olsen repeatedly lied as to the status of the criminal matter in an effort to extract an advantage in the settlement discussions.  The salient point, however, is that the issue at trial was whether Sung, with Hong and Olsen, violated Nevada criminal law, not whether the attorneys' conduct also violated rules of professional conduct standing alone.

-29-

1    Sung of course was on trial for conduct and communications alleged to violate Nevada criminal

2    statutes prohibiting extortion, witness solicitation of a bribe, and conspiracy – not rules of professional

3    conduct standing alone.

4    The state district court, after hearing argument, ruled that Stempel's testimony would not be

5    admitted.[54]

6    On direct appeal, the Supreme Court of Nevada rejected the claim presented to that court on the

7    following grounds:

8
9    . . . Sung and Kwon argue that the district court erroneously
     denied their request to call UNLV Boyd School of Law Professor Jeffrey

10   Stempel to testify as an expert witness about whether Hong and Olsen
     acted as ethical attorneys in their representation of Sung and Kwon. We

11   disagree.  NRS 50.295 provides that "[t]estimony in the form of an
     opinion or inference otherwise admissible is not objectionable because

12   it embraces an ultimate issue to be decided by the trier of fact."  Yet,
     NRS 50.275 limits the scope of expert testimony to matters that will

13   assist the trier of fact in understanding the evidence and determining an
     ultimate issue of fact.  Here, the scope of Professor Stempel's proposed

14   testimony improperly involved legal conclusions about Hong and
     Olsen's behavior, not merely factual issues.[FN15] We conclude that

15   Sung and Kwon have failed to demonstrate that the district court
     committed manifest error by excluding this testimony.

16   [FN15] See Hart-Anderson v. Hauck, 748 P.2d 937, 942

17   (Mont. 1988) ("It is for the jury to evaluate the facts in
     light of the applicable rules of law, and it is therefore

18   erroneous for a witness to state his opinion on the law of
     the forum.").

19   #34, Ex. 45, at 6-7.[55]

20   The state supreme court's rejection of this claim was neither contrary to nor an unreasonable

21   application of clearly established federal law as determined by the United States Supreme Court.

22   Sung relies upon the statement in *Davis v. Alaska*, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347,

23   that the jurors in that case "were entitled to have the benefit of the defense theory before them so that

24   they could make an informed judgment as to the weight to place on" the prosecution witness'

25   _____

26   [54]#32, Ex. 24D-4, at I-130-134.

27   [55]While the state supreme court refers to the issue being raised by both Sung and Kwon, the consolidated reply
     brief filed in that court confirms that only Sung was raising the issue, as Kwon did not seek to call Stempel as a witness.

28   #34, Ex. 44, at 24-25.  Kwon did not present a corresponding claim in his federal petition.

1   testimony." 415 U.S. at 317, 94 S.Ct. at 1111. *Davis* held that the Confrontation Clause required that

2   a defendant must be allowed to impeach the credibility of a prosecution witness by cross-examination

3   directed to possible bias based upon probationary status as a juvenile delinquent notwithstanding the

4   confidentiality of juvenile offense records. *Davis* does not establish that trial courts inexorably must

5   admit any and all evidence proffered by the defense on the premise that it supports a defense theory

6   and/or is necessary to secure a right to present a defense.

7        In the present case, Professor Stempel's anticipated testimony would have been directed, at best,

8   to an issue that was not relevant to the issues in the criminal prosecution, *i.e.,* whether the lawyers

9   violated rules of professional conduct standing alone without reference to Nevada criminal statutes.

10   The testimony, at worst, would have been seeking to advise the jury as to whether the conduct in

11   question violated Nevada criminal statutes prohibiting extortion, witness solicitation of a bribe, and/or

12   conspiracy. In the latter instance, the testimony clearly would be improper and objectionable. This

13   Court in comparable circumstances would have excluded the testimony with absolutely no qualm that

14   the defendant was being denied a right to present a proper defense theory. *See,e.g, Elsayed Mukhtar*

15   *v. California State University*, 299 F.3d 1053, 1066 n.10 (9th Cir. 2002)("an expert witness cannot give

16   an opinion as to her legal conclusion, *i.e.*, an opinion on an ultimate issue of law"). Criminal defendants

17   no doubt would like to be able to present purported legal expert witness testimony that their conduct

18   did not violate the statutes under which they were charged. However, a holding that the Constitution

19   does not require that they be permitted to pursue such "theory of defense" expert testimony clearly is

20   neither contrary to nor an objectively unreasonable application of clearly established federal law as

21   determined by the United States Supreme Court.

22        Sung's Ground 2(B) therefore does not provide a basis for federal habeas relief.

23      ***Rejection of Proposed Defense Jury Instruction (Sung Ground 2(C))***

24        Sung alleges in her federal petition that "it was error" for the state trial court to disallow a

25   proposed defense jury instruction that would have directed the jury to disregard alleged "instructions"

26   given by a witness as to the law. Sung's federal petition does not allege any violation of the federal

27   constitution. The petitioners' consolidated reply does not discuss this claim. No claim of federal

28   constitutional error was asserted in this claim on the state direct appeal. See #34, Ex. 42, at 27-28.

Sung posits that the trial court "erred" in declining to give the following instruction:

> You heard the testimony from a witness who instructed you as to the legal rights of the various parties. The testimony of any witness, including an attorney, is not an instruction or conclusion reached by the court in this case. You are to consider only the instructions provided by the judge in this case and you shall not consider any instructions on issues of law presented by any witness.

No. 2:08-cv-00917-LRH-VPC, #1, at 22; #41, Ex. 84.

Sung's petition alleges only that the trial court's disallowance of the instruction constituted error "given Mr. Singer's testimony in this case." Sung cites to a single page of the record on appeal. The Court, repeatedly, has advised petitioners' counsel that the record on appeal is not called over from the state courts and that they must cite to record exhibits in the federal record. The Court has not been able to locate any record citation as to this claim to a specific location in the federal record.

During the jury instruction conference, counsel indicated that the defense requested the proposed instruction because of testimony by Martin Singer regarding his understanding of the operation of the prior settlement agreement.[56]

The Supreme Court of Nevada rejected the claim presented to that court on the following grounds:

> Sung argues that the district court erroneously rejected her proposed jury instruction regarding Singer's testimony. Specifically, she contends that the district court should have instructed the jury as follows:
>
> > You heard the testimony from a witness who instructed you as to the legal rights of the various parties. The testimony of any witness, including an attorney, is not an instruction or conclusion reached by the court in this case. You are to consider only the instructions provided by the judge in this case and you shall not consider any instructions on issues of law presented by any witness.
>
> We disagree. District courts have broad discretion to settle jury instructions, and we review a district court's decision to give or reject proposed instructions for an abuse of discretion or judicial error. Here, Sung provides no authority supporting her assertion that the district court erred in rejecting their [sic] proposed instruction. Moreover, the substance of the proposed instruction was duplicitous [sic] of another

---

[56] #32, Ex. 24F, at 3A -19 to 20. See text, *supra*, at 3 (background facts).

1

2

> instruction – the jury had already been instructed to only follow the instructions given by the district court.  We conclude that the district court did not abuse its discretion by rejecting Sung's proposed instruction.

3

4   #34, Ex. 45, at 10-11 (exclusively state court citations omitted).

5   From the very outset, Sung has failed to state a federal claim for relief in the first instance.  She

6   alleges no violation of federal constitutional law in Ground 2(C).  Even if she, *arguendo*, had stated a

7   federal claim, she does not identify the federal constitutional provision violated, much less the United

8   States Supreme Court authority that the state court's decision either was contrary to or unreasonably

9   applied.  Sung has utterly failed to carry her burden of articulating, much less sustaining, a viable

10  federal claim in this regard.  Federal habeas review -- again -- simply is not a second direct appeal in

11  which the federal court reconsiders *de novo* any and all claims of alleged error presented to the state

12  supreme court, without regard to whether the claims of error even present an alleged federal

13  constitutional violation.

14  Sung's Ground 2(C) does not even state a federal constitutional claim, much less provide a basis

15  for federal habeas relief.

16  ### Limitation on Cross-Examination of Martin Singer (Sung Ground 3(A))

17  In her Ground 3(A), Sung alleges that she was denied unspecified rights under the Fifth, Sixth,

18  and Fourteenth Amendments when the state trial court did not permit her to cross-examine Martin

19  Singer about his law firm's website that, *inter alia*, contained a link to a magazine article that described

20  him as an "attack dog" who was willing to "get down in the gutter" to do whatever was necessary to

21  assist his clients.

22  At trial, defense counsel cross-examined Singer initially about the website and the linked article

23  entitled: "Raging Bulls, When it's Time for the Gloves to Come Off, These Attack Dogs of L.A. Law

24  Get the Call."  Singer acknowledged that he was one of several lawyers featured in the article.  The

25  State ultimately objected based upon, *inter alia*, relevance; and the trial court sustained the objection.[57]

26  The Supreme Court of Nevada rejected the claim presented to that court on the following

27

28  [57]#32, Ex. 24D-2, at I-60-63.

-33-

1  grounds:

2      . . . Sung and Kwon argue that the district court erroneously
3  limited their cross-examination of witness Martin Singer, who was the
   attorney for Angelil.  Specifically, Sung and Kwon contend that the
4  district court improperly prevented them from questioning Singer about
   references in an article published on his web site that described Singer
5  as an "attack" dog" and claimed that he was willing to get "down in the
   gutter" for his clients.  The district court concluded that this line of
6  questioning was irrelevant. These references, Sung and Kwon maintain,
   showed that Singer was a biased witness.  We disagree.

7      Although district courts have limited discretion in excluding
   extrinsic evidence showing a witness's bias, we have also recognized
8  that that discretion is properly exercised when the inquiry is "'repetitive,
   irrelevant, vague, speculative, or designed merely to harass, annoy or
9  humiliate the witness.'"  Sung and Kwon have failed to explain the
   relevance of the article on Singer's website and how prejudice resulted
10  from the limitations placed upon the cross-examination of Singer.  The
   jury was informed that Singer was Angelil's attorney and could
11  reasonably infer the nature of Singer's relationship with Angelil and how
   that might, if at all, impact his testimony.  Moreover, the jury was
12  instructed that it was to evaluate a witness' credibility or believability by
   examining "his relationship to the parties, his fears, his motives,
13  interests, or feelings."  We conclude that Sung and Kwon have failed to
   demonstrate that the district court committed manifest error by excluding
14  this evidence.

15  #34, Ex. 45, at 7-8 (single state court citation omitted).

16      Sung has not demonstrated that the state supreme court's rejection of this claim was either

17  contrary to or an unreasonable application of clearly established federal law.  Sung has not even begun

18  to shoulder her burden of establishing a basis for federal habeas relief under the highly deferential

19  standard of review under the AEDPA.  In her petition, Sung cites to two Nevada state cases.  In

20  petitioners' consolidated federal reply, this claim is not discussed.  Sung does not cite a single United

21  States Supreme Court decision with regard to this claim.  At trial, Sung got the gist of the point of the

22  article before the jury before the State's objection was sustained.  As the state supreme court intimated,

23  the jury did not need the article to infer that Singer had a potential for bias based upon his role as

24  Angelil's lawyer in the civil matter.  Under the AEDPA, "habeas corpus is a 'guard against extreme

25  malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through

26  appeal."  *Harrington*, 131 S.Ct. at 786 (quoting prior authority).  The present claim presents minutiae,

27  not a major malfunction.

28      Sung's Ground 3(A) therefore does not provide a basis for federal habeas relief.

1           ***Sufficiency of the Evidence of Witness Solicitation of a Bribe (Sung Ground 4)***

2           In her Ground 4, Sung alleges that she was denied unspecified rights under the Fifth, Sixth and

3 Fourteenth Amendments because the evidence allegedly was insufficient to convict her of witness

4 soliciting a bribe.

5           Sung relies, exclusively, on an exchange during the redirect of Martin Singer.  During cross-

6 examination, defense counsel asked Singer: "Would you ever bribe a witness, Mr. Singer?"  He

7 responded that he would not.  Then, on redirect, the following exchange occurred:

8                 Q:     Witness ever ask you for a bribe?

9                 A:     Did a witness ever ask me for a bribe?

10                 Q:     Yeah.  Potential witness ever ask you for a bribe?

11                 A:     Not that I recall.

12 #32, Ex. 24D-3, at I-91-92.

13           Sung moved for a directed verdict on the charge of witness solicitation of a bribe at the

14 conclusion of the State's case based upon this testimony.  The state district court ruled that there was

15 sufficient evidence to go to the jury on the charge.[58]

16           On direct appeal, the Supreme Court of Nevada rejected the claim presented to that court on the

17 following grounds:

18

19             . . . Sung argues that insufficient evidence supports her conviction of witness soliciting a bribe.  We disagree.  NRS 199.250

20 provides in part that it is a crime for "[a] person who is or may be a witness upon a trial, hearing, investigation . . . who asks or receives, directly or indirectly, any compensation . . . upon an agreement or

21 understanding that his testimony will be influenced thereby, or that he will absent himself from the trial, hearing, or other proceeding."  The

22 standard for reviewing a conviction is "'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier

23 of fact could have found the essential elements of the crime beyond a reasonable doubt.'"

24

25             Regardless of Singer's inability to recall a witness ever soliciting a bribe from him, Hong's and Olsen's statements and Singer's other

26 testimony established that Sung communicated to Angelil that if Angelil paid her money she would not give authorities evidence that was

27

28      [58]#32, 24E-1, at II-60 to II-61.

1
2
3

> necessary to continue their criminal investigation of Angelil based upon Sung's allegations.  If charges ever were filed against Angelil, Sung would have been a key witness.  Viewing this evidence in a light most favorable to the State, we conclude that it was sufficient to support Sung's conviction for witness soliciting a bribe.

4  #34, Ex. 45, at 12-13 (emphasis in original)(citation omitted).

5       The state supreme court's rejection of this claim was neither contrary to nor an unreasonable
6  application of clearly established federal law.

7       On a challenge to the sufficiency of the evidence, the habeas petitioner faces a "considerable
8  hurdle." *Davis v. Woodford*, 333 F.3d 982, 992 (9th Cir. 2003).  Under the standard announced in
9  *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), the jury's verdict must stand
10  if, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact
11  could have found the essential elements of the offense beyond a reasonable doubt. *E.g., Davis*, 333 F.3d
12  at 992.  Accordingly, the reviewing court, when faced with a record of historical facts that supports
13  conflicting inferences, must presume that the trier of fact resolved any such conflicts in favor of the
14  prosecution and defer to that resolution, even if the resolution by the state court trier of fact of specific
15  conflicts does not affirmatively appear in the record. *Id.*  The *Jackson* standard is applied with reference
16  to the substantive elements of the criminal offense as defined by state law. *E.g., Davis*, 333 F.3d at 992.
17  When the deferential standards of the AEDPA and *Jackson* are applied together, the question for
18  decision on federal habeas review thus becomes one of whether the state supreme court's decision
19  unreasonably applied the *Jackson* standard to the evidence at trial. *See,e.g., Juan H. v. Allen*, 408 F.3d
20  1262, 1274-75 (9th Cir. 2005).

21       As canvassed previously in the text, *supra*, at 2-14, the trial record – from Sung's trial --
22  contained ample evidence tending to establish that Sung – directly and through her agents – solicited
23  $13,500,000.00 in exchange for a promise to not turn material evidence over to the police.  Singer's
24  isolated response to a broadly-worded question on redirect does not negate the existence of such
25  evidence.  Conflicts in the evidence in all events are to be resolved by the jury.   The significance or
26  insignificance of Singer's isolated response as against the remaining evidence accordingly was a matter
27  to be weighed by the jury.  Perhaps Singer understood the broad question as pertaining to incidents in
28  his life other than the case at hand, or to a situation where the person soliciting a bribe then was a

1    witness in a court proceeding.  Questions as to such possible inferences were fodder for the jury.  They

2    do not provide a basis for reversal on federal habeas review, particularly on deferential review of a state

3    court's application of a standard that in turn defers to the jury's resolution of conflicts in the evidence.

4        Sung's Ground 4 therefore does not provide a basis for federal habeas relief.

5    ***"Improper Severance" (Sung Ground 5)***

6        In her Ground 5, Sung alleges that she was denied rights to due process and a fair trial under the

7    Fifth and Fourteenth Amendments when, after Kwon moved for and obtained a severance, the state trial

8    court denied a joint motion to reconsider the severance.

9        In early 2004, the state district court again granted a request for a continuance in the case and

10   set the matter down for trial for October 25, 2004.  The trial judge stated that the continuance was the

11   last one that would be granted.[59]

12       On July 26, 2004, Kwon filed a motion to sever based upon substantial prejudice allegedly

13   accruing to him because of prior bad acts evidence that would be introduced against Sung, because the

14   codefendants had mutually exclusive antagonistic defenses, and because of a *Bruton*[60] issue.  While the

15   State opposed the motion, nothing in the record before this Court reflects that Sung sought to oppose

16   the motion.  Kwon's reply brief in support of the motion to sever was filed on September 1, 2004.[61]

17       The state district court thereafter granted the motion and severed the cases against the two

18   defendants.[62]

19

20       [59] See,e.g., #31, Ex. 20, at 5.  The state court record exhibits filed by the parties are spotty in their coverage of

21   certain procedural background.  The minutes in the online docket records of the state district court reflect that the court reset the trial date at a April 13, 2004, motion hearing.  The indictment was filed on March 5, 2003. #31, Ex. 1.  The online minutes can be accessed from a link at:  http://www.clarkcountycourts.us/criminal/index.html.

22

23       [60] *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).

24       [61] #31, Exhs. 8-10.

25       [62] The minutes in the online docket records of the state district court (see note 59, *supra*) reflect that the court granted the motion to sever at a September 7, 2004, motion hearing.  Sung alleges in her petition that Kwon was not

26   present at the hearing on the motion to sever.  The August 17, 2004, and September 7, 2004, online state court minutes reflect, however, that Kwon's counsel waived his appearance for the motion hearing.  If the allegation that Kwon was

27   not present at the motion hearing had any – material – significance as to an – exhausted – claim, Sung should have demonstrated same by presentation of the relevant record materials along with pertinent argument.  The allegation,

28                                                        (continued...)

1          At some point thereafter, Kwon secured new counsel.

2          On October 7, 2004, just two weeks and two judicial days prior to Sung's October 25, 2004, trial

3   date, Kwon and Sung filed a motion to reconsider the grant of Kwon's motion for a severance.  The

4   motion maintained that "a severance of trial is not necessary and would not be unfairly prejudicial to

5   either Defendant."  Kwon's new counsel stated that she did not believe that it was in Kwon's best

6   interests to sever the trial.  However, the motion did not seek to affirmatively establish that severance

7   would be prejudicial as opposed to a joint trial not being unfairly prejudicial.[63]

8          On Friday, October 15, 2004, the state trial court held a hearing on the motion for

9   reconsideration as well as upon a motion for a continuance of the trial date filed by Sung.  The Monday,

10  October 25, 2004, trial was for all practical purposes only one week away.  The state trial judge adhered

11  to her prior admonition that the continuance granted previously was the last time that she was going to

12  continue Sung's trial.  She accordingly denied the last-minute motion for a continuance.  It was

13  undisputed that Kwon's replacement counsel could not be ready for the October 25, 2004, trial.  The

14  court therefore denied the motion to reconsider the grant of Kwon's prior motion for a severance.[64]

15         On direct appeal, the Supreme Court of Nevada rejected the claim presented to that court on the

16  following grounds:

17              Sung and Kwon argue that the district court erroneously granted
         their motion to sever their trials.  We disagree.  The record reveals that
18       Kwon moved to sever his trial from Sung and the district court granted
         the motion.  Although Kwon later unsuccessfully sought to re-join the
19       trials after obtaining new counsel, we have held that an "appellant may
         [not] consciously invite district court action perceived as favorable to
20       him, and then claim it as error on appeal."  Because Kwon moved the
         district court to sever his trial from Sung's trial, we conclude that he is

21

22

23       [62](...continued)
    standing alone, that Kwon was not present at the motion hearing does not necessarily reflect any impropriety.  The Court
24  would note that Kwon was ejected by the court bailiff at a September 30, 2004, proceeding because of his failure to
    comply with repeated prior instructions that he could not converse with Sung under rules regarding contact between
25  inmates. #40, Ex. 52, at 2.  Again, if there was some material significance to Kwon not being at the September 7, 2004,
    motion hearing after his appearance was waived by counsel, it was incumbent upon Sung to establish that materiality
26  with both supporting record materials and apposite argument.  She has not done so herein.

27       [63]#31, Ex. 18.

28       [64]#31, Ex. 20, at 3-11.

                                            -38-

estopped from now asserting that action as error on appeal.  Moreover, "[t]he decision to join or sever charges is within the discretion of the district court, and an appellant caries [sic] the heavy burden of showing that the court abused that discretion."  Here, Sung's and Kwon's assertions that they were prejudiced by the severance because "it lent the appearance of division" and that Kwon could not testify at Sung's trial are speculative.  We conclude that Sung and Kwon have failed to demonstrate that the district court abused its discretion by severing their trials.

#34, Ex. 45, at 10 (state court citations omitted).

The state supreme court's rejection of the claim presented to that court was neither contrary to nor an unreasonable application of clearly established federal law as determined by the United States Supreme Court.

Here, too, Sung has not even begun to shoulder her burden of establishing a basis for federal habeas relief under the highly deferential standard of review under the AEDPA.  As in the state supreme court, Sung alleges in her federal petition only that she was prejudiced by the severance vaguely "because it lent the appearance of division" and because testimony from Kwon would have been "of benefit" in her trial.[65]  In petitioners' consolidated federal reply, this claim is not even discussed.  Sung does not cite a single United States Supreme Court decision with regard to this claim.  Her claim is not only unsupported by any Supreme Court authority, her claim of improper severance – as opposed to improper *joinder* – is a dubious one to the extreme.  In all events, even assuming some as yet unarticulated applicable constitutional doctrine, this Court would not find error, even on a *de novo* review, in the circumstances presented.  Sung did not oppose Kwon's motion for severance, and she then sought rejoinder of the cases only two weeks before a hard trial date where rejoinder would necessitate a continuance of her trial.  At some point, criminal defendants must make choices, and live with them.   The opportunities for criminal defendants to manipulate the system based upon similar amorphous claims of "prejudicial" severance in such circumstances are virtually limitless.

Sung's Ground 5 accordingly does not provide a basis for federal habeas relief.

/ / / /

/ / / /

---

[65] Kwon testified at his own trial, and he was convicted.

***Request to Wear Jailhouse Clothing on First Trial Day (Sung Ground 6)***

In her Ground 6, Sung alleges that she was denied a right to a fair trial under the Fifth and Fourteenth Amendments when, after the jailers brought her to court in the clothes that she had been in when she was received from federal immigration custody, the trial court denied her request to be able to go back to the jail and change into her jailhouse garb.

The trial transcript reflects that, prior to voir dire on the first day of trial, a number of issues were addressed outside the presence of the prospective jury panel at 12:55 p.m.[66] Sung's counsel asked that Sung be taken back to the jail to change into her jailhouse garb, agreeing to waive any issues as to her appearing before the jury in jailhouse clothing.  Counsel advised that he had tried to communicate with various personnel in the jail that morning in an effort to have Sung – no doubt merely one of a large number of detainees being transported for one purpose or another on a Monday morning in a major metropolitan jail – brought over in her jail garb.  He apologized to the court for "this delay" that apparently had been caused by his efforts.[67]

After hearing argument from both counsel, the trial judge stated:

> Okay.  Well, the way she's dressed now it the way she's going to stay.  I'm not sending her back to the jail to change clothes at this time, because we're getting ready to start.

#32, Ex. 24A, at 1A-4.

The judge then canvassed Sung personally to confirm that she wanted to wear her jailhouse attire on the following trial days and that she was waiving any issue as to appearing before the jury in jailhouse attire.  It appears that Sung, as she wished, did in fact appear in jailhouse attire on the remaining trial days.  The issue raised here appears to concern only the first half trial day.[68]

The discussion of the issue on the first day – with a prospective jury panel apparently on hold waiting for voir dire to commence – included, *inter alia*, the following:

---

[66]#32, Ex. 24A.  The voir dire itself was not transcribed, so voir dire proceedings, if any, conducted earlier in the day would not have been transcribed.  The minutes the online docket records of the state district court  (see note 59, *supra*,) suggest a 10:30 a.m., start time, although this perhaps  may have been a calendared rather than actual start time.

[67]#32, Ex. 24A, at 1A-2 -3.

[68]*See id.*, at 1A-5-7.

| | | |
|---|---|---|
| THE COURT: | [Directly to Sung, while canvassing her] Well, today, because you're here, and it's 1:00 o'clock, and I want to start the trial and I don't want to have you taken back and changed and brought back, you'll be in the clothes that you're in today. | |

. . . . .

THE COURT: Okay.  And, Mr. Langford [Sung's counsel], you'd waive any defect as far as any appellate issue if she's convicted, and the fact that she was wearing jail garb would not be an issue that would be raised on appeal?

MR. LANGFORD: Absolutely.  I mean, the *only* issue is, in my opinion what she's wearing now --.

THE COURT: I understand.

MR. LANGFORD: – is worse than the jail garb.

THE COURT: I understand.

MR. LANGFORD: I would waive jail garb.

THE COURT: I understand.

[To the bailiff] Are you gathering up the jury?

THE BAILIFF: *Two more minutes, Judge*.

THE COURT: Okay.  And then anything else before we start?

#32, Ex. 24A, at 1A-5-7 (emphasis added).

As matters developed, the venire did not arrive in the stated just two more minutes.  While they were waiting for the venire, the court and counsel discussed another issue.  The transcript then shows that they were standing by waiting for the jury panel.  The prospective jury panel arrived in the courtroom at 1:36 p.m.[69]

On direct appeal, the Supreme Court of Nevada rejected the claim presented to that court on the following grounds:

Sung argues the district court committed reversible error when it refused her request to wear her jail clothing during the first day of trial.

---

[69]#32, Ex. 24A, at 1A-7-12.

-41-

We disagree.  Although a defendant may elect to wear jail clothing as a strategy to invoke juror sympathy,[FN25] the record reveals that Sung did not make her request to change from civilian clothing back into her jail clothing until minutes before the first day of her trial was scheduled to begin.  Sung cites to no authority supporting the proposition that she had a constitutional right to wear jail clothing at trial,[FN 26] and she fails to demonstrate that she was prejudiced by the civilian clothes she wore during trial.  We conclude that the district court did not commit reversible error by denying Sung's request.

[FN25]  See Estelle v. Williams, 425 U.S. 501, 507-08 (1976).

[FN26] Cf. Duckett v. State, 104 Nev. 6, 10, 752 P.2d 752, 754 (1988)(citing to Estelle, 425 U.S. at 512, for the rule that a defendant cannot be compelled to stand trial wearing identifiable prison clothes).

#34, Ex. 45, at 11-12.

The state supreme court's rejection of this claim was neither contrary to nor an unreasonable application of clearly established federal law as determined by the United States Supreme Court.

Sung urges in her petition[70] that the United States Supreme Court was "clear in its rule about the wearing of jail garb during a jury trial" in *Estelle v. Williams*, 425 U.S. 501, 96 S.Ct. 1691, 48 L.Ed.2d 126 (1976).  She relies upon the following passage from the decision:

. . . [T]he courts have refused to embrace a mechanical rule vitiating any conviction, regardless of the circumstances, where the accused appeared before the jury in prison garb.  Instead, they have recognized that the particular evil proscribed is compelling a defendant, against his will, to be tried in jail attire.  The reason for this judicial focus upon compulsion is simple; instances frequently arise where a defendant prefers to stand trial before his peers in prison garments.  The cases show, for example, that it is not an uncommon defense tactic to produce the defendant in jail clothes in the hope of eliciting sympathy from the jury.  *Andern v. Watt*, 475 F.2d 881, 882 (CA10 1973); *Watt v. Page, supra*, 452 F.2d, at 1176.  Cf *Garcia v. Beto*, 452 F.2d 655, 656 (CA5 1971).  This is apparently an accepted practice in Texas courts, *Barber v. State*, 477 S.W.2d 868, 870 (Tex.Crim.App.1972), including the court where respondent was tried.

425 U.S. at 507-08, 96 S.Ct. at 1694-95.

Petitioner's argument confuses the holding of a court and *dicta*.  The *holding* in *Estelle v. Williams* was that, while the State could not compel a defendant to appear at trial in jail garb, the failure

---

[70]Petitioner does not provide any argument on this claim in the consolidated federal reply.

-42-

1    to object negated an inference of compulsion.  425 U.S. at 512-13, 96 S.Ct. at 1697.  The *dictum* upon

2    which petitioner relies merely states that it was a not uncommon defense tactic for a defendant to appear

3    in jail clothes to elicit sympathy.  The Supreme Court did not hold in the case that a defendant had a

4    federal constitutional right to appear in her jail clothing.  Indeed, even the *dictum* upon which she relies

5    merely observed that it was a tactic of some defendants to appear in jail garb.  The language upon which

6    she relies does not state – in any respect – that the federal constitution did, or even might, require that

7    a defendant be allowed to do so.

8         "Clearly established federal law" under § 2254(d)(1) consists of "the holdings, as opposed to the

9    *dicta*," of the decisions of the United States Supreme Court, as of the time of the relevant state-court

10   decision under review.  *Williams v. Taylor*, 529 U.S. 362, 412, 120 S.Ct. 1495, 1523, 146 L.Ed.2d 389

11   (2000).  Petitioner has not identified any apposite *holding* of the United States Supreme Court clearly

12   establishing a constitutional right to wear jailhouse attire at trial.  Her claim therefore does not even

13   make it out of the starting gate under the AEDPA.  She has not identified any apposite *holding* of the

14   United States Supreme Court that was contrary to the Nevada Supreme Court's decision or that was

15   unreasonably applied by the state supreme court.[71]

16        Under the AEDPA, again, "habeas corpus is a 'guard against extreme malfunctions in the state

17   criminal justice systems,' not a substitute for ordinary error correction through appeal."  *Harrington v.*

18   *Richter*, 131 S.Ct. at 786 (quoting prior authority).  The present claim, once again, presents minutiae,

19   not a major malfunction.

20        In this regard, petitioner urges that the state trial court easily could have accommodated her

21   request because it allegedly would take only fifteen minutes for her to change and more than that

22   amount of time elapsed before the venire was brought in.  The trial court's information at the time,

23   however, was that the venire was only two minutes away.  The trial apparently already had been delayed

---

[71] Sung's cites in the federal petition to two Nevada state cases decided by "this Court."  This obvious direct cut-and-paste from the briefing on the state direct appeal  exemplifies the extent to which both petitioners have presented this matter as if it merely were a *de novo* replay of their state direct appeal.  It is not.  Petitioners must demonstrate that the rejection of their claims by the Supreme Court of Nevada was either contrary to or an unreasonable application of clearly established *federal* law as determined by the *United States Supreme Court.*  This same basic misconception occurs repeatedly in petitioners' pleadings and arguments in this matter.

1   a substantial portion of time because of defense counsel's last minute efforts to have the jailers bring

2   Sung over in her jail garb.  There was no guarantee – other than defense counsel's not necessarily

3   unbiased assessment – that sending the defendant back over to a busy metropolitan jail on a Monday

4   to change would take "only fifteen minutes."  Trial judges have to essentially ride herd on a number of

5   moving parts at the start of a trial to get the trial started.  In this instance, the parties had to wait on the

6   venire.  If the judge instead had allowed Sung to be taken back to the jail to change, the situation instead

7   could have been one where the judge was having to hold the individuals in the venire, potentially for

8   a substantial amount of time, if more unanticipated delays were encountered at the jail.  Moving

9   defendants who are in custody is not always a quick and easy process without unavoidable delays.  The

10  bottom line as to the time element is that defense counsel could have – and should have – avoided the

11  entire situation by not waiting until the last minute on the very day of trial in a busy state court and

12  major metropolitan jail to try and address what Sung would be wearing.

13          Petitioner further urges that the clothing that she was in was worse than her jailhouse clothing

14  and that the attire included a purple sweatshirt.  Outside of a defendant being compelled to appear

15  before a jury in jailhouse attire, it is subject to substantial question whether fashion sense is – or ever

16  will be – constitutionalized under the Due Process Clause.  The trial judge observed what Sung was

17  wearing, and she found that "the jail jumpsuit . . . would be far worse than being in whatever clothing

18  she has on today now."[72]  To any extent that the Due Process Clause, *arguendo*, *did* constitutionalize

19  fashion sense, the state trial judge's finding is entitled to a presumption of correctness on federal habeas

20  review that may be overcome only upon clear and convincing evidence.  28 U.S.C. § 2254(e)(1).

21  Petitioner's bald assertion that the clothing that she was in was more prejudicial than jailhouse garb

22  indisputably does not constitute clear and convincing evidence.

23          This Court sincerely would hope and trust that the validity of a state court judgment of

24  conviction under the United States Constitution never will turn upon such inconsequential minutiae as

25  this, under any standard of review.

26          Sung's Ground 6 does not provide a basis for federal habeas relief.

27

28          [72]#32, Ex. 24A, at 1A-5.

-44-

1      ***Alleged Double Jeopardy Violation (Sung Ground 7)***

2          In her Ground 7, Sung alleges that she was punished twice in violation of the Double Jeopardy

3  Clause when she was sentenced to consecutive terms of imprisonment on the charges of extortion and

4  witness solicitation of a bribe.  She maintains that the offenses constitute the "same offense" under the

5  test in *Blockburger v. United States*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932).

6          As noted previously, the Supreme Court of Nevada reversed Sung's conviction on the extortion

7  count for trial error and remanded.  The State opted to not pursue the charge further on remand.

8          On direct appeal, given its action on the extortion conviction, the Supreme Court of Nevada did

9  not reach Sung's double jeopardy claim on the merits:

10             Because we reverse Sung's and Kwon's convictions for
       conspiracy to commit extortion and extortion, we do not reach the issue
11             whether these counts are redundant with their convictions for witness
       soliciting a bribe and violate the Double Jeopardy Clause of the United
12             States Constitution.

13  #34, Ex. 45, at 3 n.8.

14          Respondents contend in the answer that Ground 7 first is moot and second is without merit.

15          Sung does not address this claim in the reply.

16          The Double Jeopardy Clause places few, if any, limits on the power of federal and state

17  legislatures to define offenses.  *See,e.g.*, *Sanabria v. United States*, 437 U.S. 54, 69-70, 98 S.Ct. 2170,

18  2181-82, 57 L.Ed.2d 43 (1978).  But once the legislature has defined a statutory offense by determining

19  the "allowable unit of prosecution," that legislative determination as to the scope of the offense then

20  dictates the scope of protection provided by the Double Jeopardy Clause.  *Id.*  That is, once the

21  allowable unit of prosecution has been defined by the legislature, the Double Jeopardy Clause then bars

22  a subsequent prosecution for that same offense following an acquittal, bars a subsequent prosecution

23  for the same offense following a prior conviction, and bars multiple consecutive punishments for the

24  same offense where the legislature did not intend multiple punishments.  *See,e.g., id.*; *Jones v. Thomas*,

25  491 U.S. 376, 380-82, 109 S.Ct. 2522, 2525-26, 105 L.Ed.2d 322 (1989); *Ohio v. Johnson*, 467 U.S. 493,

26  497-500, 104 S.Ct. 2536, 2540-41, 81 L.Ed.2d 425 (1984).

27          When a single act or transaction violates two separate statutes, the *Blockburger* "same evidence"

28  test is applied  – as a rule of statutory construction – to determine the allowable unit of prosecution, *i.e.*,

1   whether the offenses constitute the "same offense" for double jeopardy purposes.   Under the

2   *Blockburger* "same evidence" test, "the test to be applied to determine whether there are two offenses

3   or only one is whether each provision requires proof of an additional fact that the other does not."

4   *Blockburger*, 284 U.S. at 304, 52 S.Ct. at 182 (a prosecution for a single morphine sale to a single

5   purchaser for failure to sell the drug in the original stamped package in violation of 26 U.S.C. § 692 and

6   for failure to sell the drug pursuant to a written order in violation of 26 U.S.C. § 696 did not result in

7   prosecution for the same offense because each statute required proof of a fact that the other did not).

8         The *Blockburger* test, however, is only a rule of statutory construction to help determine the

9   legislative intent as to the allowable unit of prosecution when a single act violates two statutes.  *See,e.g.,*

10  *Garrett v. United States*, 471 U.S. 773, 778-79, 105 S.Ct. 2407, 2411-12, 85 L.Ed.2d 764 (1985).   The

11  *Blockburger* rule of construction must yield to a plainly expressed contrary intent by the legislature

12  regarding the allowable unit of prosecution.  *Id.*

13        Sung currently is neither subjected to nor threatened with the prospect of consecutive sentences

14  for extortion and witness soliciting a bribe.   In the final analysis, she served only the one sentence on

15  the conviction for witness soliciting a bribe; and on the record presented to this Court that is the only

16  sentence that she ever will serve in the case.   Particularly given the complete absence of any argument

17  to the contrary by Sung, the Court holds that Ground 7 is moot and does not present a live justiciable

18  controversy.[73]

19        Sung's Ground 7 therefore does not provide a basis for federal habeas relief.

20        ***Alleged Cumulative Error (Kwon Ground 4 & Sung Ground 1)***

21        Kwon and Sung allege that they were denied a right to due process in violation of the Fifth and

22  Fourteenth Amendments due to cumulative error.   They contend that the errors that resulted in the

23  reversal of the extortion and conspiracy to commit extortion convictions impacted the fairness of the

24  ───────────────

25    [73] The Court further is not sanguine that extortion and witness soliciting a bribe constitute the same offense
    under the *Blockburger* test -- assuming, *arguendo*, that the state supreme court would have given that test controlling

26  weight in determining whether the Nevada legislature intended to impose multiple punishments for the two charges.   The
    intent of the legislature, as construed by the state supreme court, is the determinative inquiry.   As on direct appeal in the

27  state supreme court, however, this Court has had no occasion to consider the issue further.   The Court further expresses no
    opinion as to whether the issue was exhausted in the state courts in the procedural posture presented and whether Sung

28  would have been able to seek federal review of this particular type of double jeopardy issue in advance of a retrial.

-46-

1    trials on the witness solicitation of a bribe convictions.  They further maintain that this collateral impact

2    together with the remaining alleged errors canvassed herein gave rise to reversible cumulative error.

3          As noted, the Supreme Court of Nevada reversed the extortion and conspiracy to commit

4    extortion convictions on direct appeal.

5          At trial, the jury instructions in each case defined the crime of extortion as follows:

6

7              Every person who, with the intent thereby to extort or gain any
           money or other property, or who with the intent thereby to compel or
           induce another to make, subscribe, or execute any instrument or writing
8          affecting or intended to affect any cause of action, whether or not such
           purpose is accomplished, threatens either directly or indirectly:

9

10             1. To accuse any person of a crime;

11             2. To do an injury to any person or to any property;

12             3. To publish or connive at publishing any libel;

13             4. To expose or impute to any person any deformity or disgrace; or

14             5. To expose any secret;

15         shall be guilty of the crime of extortion.

16             A person need not threaten, directly or indirectly, to do all of the
           acts set forth as 1 through 5 above, but must threaten, directly or
           indirectly, to [do] one or more of them.
17

18   #32, Ex. 25, Instruction No. 9 (Sung trial); #34, Ex. 39, Instruction No. 7 (Kwon trial).

19         The State had relied upon – as one of its theories – a libel theory in seeking to establish extortion

20   and conspiracy to commit extortion.  The trial court, however, precluded Kwon and Sung from

21   presenting truth as a defense.   The court barred them from presenting evidence of truth of the

22   allegations, and the court rejected a jury charge accurately defining libel.  The Supreme Court of Nevada

23   held that the trial court erred when it did not allow Kwon and Sung to pursue a defense of truth of the

24   allegations.  The state high court further held that reversal was required because general verdicts had

25   been used and it therefore was not possible to determine whether the juries had relied upon the libel

26   theory of extortion in convicting Kwon and Sung.  The state supreme court did not reverse the

27   convictions for witness soliciting a bribe. #34, Ex. 45, at 1-3 & 14.

28         ////

-47-

The Supreme Court of Nevada summarily rejected petitioners' cumulative error claim on direct appeal:

> Sung and Kwon argue they are entitled to relief because of cumulative error that occurred during their trials. For reasons discussed above [referring to the 14 pages of reasons on the claims individually], we deny them relief on this basis. See Hernandez v. State, 118 Nev. 513, 535, 50 P.3d 1110, 1115 (2002).

#34, Ex. 45, at 14 n.30.

In *Harrington v. Richter*, *supra*, the Supreme Court emphatically rejected any notion that a summary rejection of a claim is entitled to less deference on AEDPA review. The Supreme Court held that "[w]here a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." 131 S.Ct. at 784. The Court made it clear that satisfying this burden is every bit as difficult in a case with a summary denial as it is in a case with a fully-articulated decision, under the deferential standard quoted at length previously herein. *See* 131 S.Ct. at 786-87.

Under this standard, the state supreme court's rejection of petitioners' claim of cumulative error was neither contrary to nor an unreasonable application of clearly established federal law.

Petitioners' argument based upon a collateral impact from the errors on the extortion and conspiracy to commit extortion charges is flawed. Petitioner's seek to reduce the entirety of the State's "theory of the case" – as to all charges – to the proposition that their civil case was a fraud and baseless. Having so cabined the State's alleged single unitary theory of the case to this one proposition, they then maintain that their inability to pursue truth of the allegations as a defense impacted the conviction on all charges. This "straw man" argument seeks to gloss over the fact that the truth or falsity of their allegations had nothing to do with the elements required to establish witness solicitation of a bribe. Proof of that offense required proof only that a person who is or may be a witness in an investigation sought compensation upon an agreement or understanding that his or her testimony would be influenced thereby.[74] This argument -- as with all of petitioners' arguments seeking to reduce the witness solicitation charge to merely a subsidiary aspect of the extortion charge -- thus is unpersuasive.

_____

[74]#32, Ex. 25, Instruction No. 11 (Sung trial); #34, Ex. 39, Instruction No. 8 (Kwon trial).

-48-

1   The state supreme court's rejection of petitioners' other individual claims of error was neither

2   contrary to nor an unreasonable application of clearly established federal law, for the reasons canvassed

3   previously herein.   The state supreme court's corresponding rejection of their cumulative error claim

4   was neither contrary to or an unreasonable application of clearly established federal law, including the

5   Supreme Court decision in *Chapman v. California*, 386 U.S. 18,  87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

6   A determination that alleged cumulative error did not so infect the trial with unfairness as to render the

7   convictions a denial of due process was not objectively unreasonable in this case.   Petitioners'

8   arguments are in large part merely a rehash of arguments on individual claims that were rejected by the

9   state supreme court in a decision that withstands deferential AEDPA review.

10   Kwon's Ground 1 and Sung's Ground 4 therefore do not provide a basis for federal habeas

11   relief.

12   ### *Consideration of Possible Issuance of a Certificate of Appealability*

13   Under Rule 11 of the Rules Governing Section 2254 Cases, the district court must issue or deny

14   a certificate of appealability (COA) when it enters a final order adverse to the applicant.   A district court

15   order granting or denying a certificate of appealability does not eliminate the requirement that the

16   petitioner must file a timely notice of appeal in order to appeal the court's judgment.   A motion to

17   reconsider the order regarding a certificate of appealability does not extend the time to appeal.

18   As to the claims rejected by the district court on the merits, under 28 U.S.C. § 2253(c), a

19   petitioner must make a "substantial showing of the denial of a constitutional right" in order to obtain

20   a certificate of appealability.   *Slack v. McDaniel*, 529 U.S. 473, 483-84, 120 S.Ct. 1595, 1603-04, 146

21   L.Ed.2d 542 (2000); *Hiivala v. Wood*, 195 F.3d 1098, 1104 (9th Cir. 1999).   To satisfy this standard,

22   the petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the

23   constitutional claim debatable or wrong."   *Slack*, 529 U.S. at 484, 120 S.Ct. at 1604.

24   The Court denies a COA as to all claims, for the reasons outlined below.

25   ### *Quashing of Rene Angelil Subpoena (Kwon Ground 1)*

26   Kwon alleges that he was denied rights to due process, to confront and cross-examine witnesses

27   against him, to call witnesses at trial and to present a defense under the Fifth, Sixth, and Fourteenth

28   Amendments when the state trial court quashed his subpoena of Rene Angelil.   Jurists of reason would

1    not find the rejection of this claim debatable or wrong.  Kwon's counsel simply failed to timely and

2    properly serve a subpoena on Angelil.  The state supreme court's determination that the subpoena was

3    properly quashed under Nevada state law as untimely and for lack of proper service is the end of the

4    matter in that regard.   Kwon in essence seeks constitutionally required enforcement of *invalid*

5    compulsory process on the basis of the alleged relevancy of the witness' testimony.  If petitioner did

6    not effect valid compulsory process of the witness in the first instance, the alleged relevancy of his

7    testimony becomes immaterial -- as do rights to call and cross-examine the witness and to present a

8    defense based upon his testimony.  Reasonable jurists therefore would not find debatable or wrong this

9    Court's conclusion that the state supreme court's rejection of this claim was neither contrary to nor an

10   unreasonable application of clearly established federal law.  See text, *supra*, at 16-19.

11         ***Alleged Brady Violation as to Martin Singer File (Kwon Ground 2 & Sung Ground 3(B))***

12         Kwon and Sung allege that they were denied due process of law in violation of the Fifth and

13   Fourteenth Amendments when the state district court did not order private attorney Martin Singer to

14   produce his file on his client, Rene Angelil.  Jurists of reason would not find the rejection of this claim

15   debatable or wrong.  Petitioners have not cited any apposite Supreme Court authority establishing that

16   a state district court can – much less must – compel a private attorney who is a complaining witness and

17   who was used by the police in a sting operation must turn over his client's files pursuant to *Brady*, on

18   the premise that the attorney is a "state actor."  Petitioners cite only the most general – and inapposite

19   – case authority.    The Supreme Court of Nevada clearly was not required to accept the novel

20   proposition advanced by petitioners based on such inapposite authority.  Even on a *de novo* review, the

21   strained argument would face a steep uphill struggle.   Reasonable jurists therefore would not find

22   debatable or wrong this Court's conclusion that the state supreme court's rejection of this claim was

23   neither contrary to nor an unreasonable application of clearly established federal law.  See text, *supra*,

24   at 19-22.

25         ***Hong and Olsen Coconspirator Statements (Kwon Ground 3 & Sung Ground 2(A))***

26         Kwon and Sung allege that they were denied rights to due process and to confront and cross-

27   examine witnesses when the out-of-court statements of their civil attorneys, Joseph Hong and Michael

28   Olsen, were admitted as coconspirator statements.  Jurists of reason would not find the rejection of this

1   claim debatable or wrong.  Petitioners' premise that the coconspirators were making testimonial

2   statements to Martin Singer prior to and during the sting operation because Singer was a "state actor"

3   is not supported by clearly established federal law.  The Second, Third, Sixth,  Seventh, Tenth and

4   Eleventh Circuits have held in published decisions following *Crawford* that a declarant's statements

5   to a private party informant are not testimonial because the declarant is not making the statements with

6   an expectation that the statements later may be used at trial.  The Sixth Circuit additionally has held that

7   statements made *directly to an undercover officer* similarly are not testimonial because, again, the

8   declarant is not making the statements with an expectation that the statements later may be used at trial.

9   If numerous federal circuits have held that statements made to an undercover informant are not

10   testimonial, then, clearly, the Nevada Supreme Court's holding that the statements made to Singer prior

11   to and during the sting operation were not testimonial was not an unreasonable application of *Crawford*.

12   Reasonable jurists therefore would not find debatable or wrong this Court's conclusion that the state

13   supreme court's rejection of this claim was neither contrary to nor an unreasonable application of clearly

14   established federal law.  See text, *supra*, at 22-27.

15                ***Disallowance of Rebuttal Testimony by Law Professor on Ethics (Sung Ground 2(B))***

16         Sung alleges in her federal petition that "it was error" for the state trial court to disallow expert

17   testimony by a law professor who allegedly would have testified that the statements made by Hong and

18   Olsen during the settlement negotiations were well within the confines of current legal and ethical

19   guidelines for the settlement of civil actions.  In the federal reply, she urges that she thus was denied

20   her right to present a defense in violation of the Fifth Amendment by the exclusion of the professor's

21   testimony and report.  Jurists of reason would not find the rejection of this claim debatable or wrong.

22   The anticipated testimony would have been directed, at best, to an issue that was not relevant to the

23   issues in the criminal prosecution, *i.e.,* whether the lawyers violated rules of professional conduct

24   standing alone without reference to Nevada criminal statutes.  The testimony, at worst, would have been

25   seeking to advise the jury as to whether the conduct in question violated Nevada criminal statutes

26   prohibiting extortion, witness solicitation of a bribe, and/or conspiracy.  In the latter instance, the

27   testimony clearly would be improper and objectionable.  A holding that the Constitution does not

28   require that defendants be permitted to pursue such "theory of defense" expert testimony as to whether

1    the defendant is guilty of the offense under the governing law clearly is neither contrary to nor an

2    objectively unreasonable application of clearly established federal law as determined by the United

3    States Supreme Court.  See text, *supra*, at 28-31.

4        *Rejection of Proposed Defense Jury Instruction (Sung Ground 2(C))*

5      Sung alleges in her federal petition that "it was error" for the state trial court to disallow a

6    proposed defense jury instruction that would have directed the jury to disregard alleged "instructions"

7    given by a witness as to the law.  Sung's federal petition does not allege any violation of the federal

8    constitution.  The petitioners' consolidated reply does not discuss this claim.  No claim of federal

9    constitutional error was asserted in this claim on the state direct appeal.  Jurists of reason would not find

10   the rejection of this claim debatable or wrong.  See text, *supra*, at 31-33.

11       *Limitation on Cross-Examination of Martin Singer (Sung Ground 3(A))*

12     In her Ground 3(A), Sung alleges that she was denied unspecified rights under the Fifth, Sixth,

13   and Fourteenth Amendments when the state trial court did not permit her to cross-examine Martin

14   Singer about his law firm's website that, *inter alia*, contained a link to a magazine article that described

15   him as an "attack dog" who was willing to "get down in the gutter" to do whatever was necessary to

16   assist his clients.  Jurists of reason would not find the rejection of this claim debatable or wrong.  Sung

17   has not even begun to shoulder her burden of establishing a basis for federal habeas relief under the

18   highly deferential standard of review under the AEDPA.  In her petition, Sung cites to two Nevada state

19   cases.  In petitioners' consolidated federal reply, this claim is not discussed.  Sung does not cite a single

20   United States Supreme Court decision with regard to this claim.  At trial, Sung got the gist of the point

21   of the article before the jury before the State's objection was sustained.  Under the AEDPA, "habeas

22   corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute

23   for ordinary error correction through appeal."  *Harrington v. Richter*, 131 S.Ct. at 786 (quoting prior

24   authority).  The present claim presents minutiae, not a major malfunction.  See text, *supra*, at 33-34.

25       *Sufficiency of the Evidence of Witness Solicitation of a Bribe (Sung Ground 4)*

26     In her Ground 4, Sung alleges that she was denied unspecified rights under the Fifth, Sixth and

27   Fourteenth Amendments because the evidence allegedly was insufficient to convict her of witness

28   soliciting a bribe.  Jurists of reason would not find the rejection of this claim debatable or wrong.  The

1   trial record contained ample evidence tending to establish that Sung – directly and through her agents

2   – solicited $13,500,000.00 in exchange for a promise to not turn material evidence over to the police.

3   Singer's isolated response to broadly-worded question on redirect that he did not recall "ever" being

4   solicited for a bribe by a witness does not negate the existence of such evidence.   Conflicts in the

5   evidence in all events are to be resolved by the jury.    The significance or insignificance of Singer's

6   isolated response as against the remaining evidence accordingly was a matter to be weighed by the jury.

7   Reasonable jurists therefore would not find debatable or wrong this Court's conclusion that the state

8   supreme court's rejection of this claim was neither contrary to nor an unreasonable application of clearly

9   established federal law.  See text, *supra*, at 35-37.

10          ***"Improper Severance" (Sung Ground 5)***

11          In her Ground 5, Sung alleges that she was denied rights to due process and a fair trial under the

12   Fifth and Fourteenth Amendments when, after Kwon moved for and obtained a severance,  the state trial

13   court denied a joint motion to reconsider the severance.  Jurists of reason would not find the rejection

14   of this claim debatable or wrong.  Here, too, Sung has not even begun to shoulder her burden of

15   establishing a basis for federal habeas relief under the highly deferential standard of review under the

16   AEDPA.  As in the state supreme court, Sung alleges in her federal petition only that she was prejudiced

17   by the severance vaguely "because it lent the appearance of division" and because testimony from Kwon

18   would have been "of benefit" in her trial.  In petitioners' consolidated federal reply, this claim is not

19   even discussed.  Sung does not cite a single United States Supreme Court decision with regard to this

20   claim.  Her claim is not only unsupported by any Supreme Court authority, her claim of improper

21   severance – as opposed to improper *joinder* – is a dubious one to the extreme.  In all events, even

22   assuming some as yet unarticulated applicable constitutional doctrine, this Court would not find error,

23   even on a *de novo* review, in the circumstances presented.  Sung did not oppose Kwon's motion for

24   severance, and she then sought rejoinder of the cases only two weeks before a hard trial date where

25   rejoinder would necessitate a continuance of her trial.  Reasonable jurists therefore would not find

26   debatable or wrong this Court's conclusion that the state supreme court's rejection of this claim was

27   neither contrary to nor an unreasonable application of clearly established federal law. See text, *supra*,

28   at 37-39.

1        ***Request to Wear Jailhouse Clothing on First Trial Day (Sung Ground 6)***

2            In her Ground 6, Sung alleges that she was denied a right to a fair trial under the Fifth and

3    Fourteenth Amendments when, after the jailers brought her to court in the clothes that she had been in

4    when she was received from federal immigration custody, the trial court denied her request to be able

5    to go back to the jail and change into her jailhouse garb.  The request was presented on the first trial day

6    at a point where the bailiff advised the presiding judge that the venire was two minutes away from the

7    courtroom.  Jurists of reason would not find the rejection of this claim debatable or wrong.  Sung cites

8    no apposite holding of the United States Supreme Court establishing a right to appear in jailhouse garb.

9    The claim, including the complaint about thus having to wear a purple sweatshirt on the first trial day,

10   once again, presents minutiae, not an extreme malfunction in the state criminal proceeding.  Reasonable

11   jurists therefore would not find debatable or wrong this Court's conclusion that the state supreme

12   court's rejection of this claim was neither contrary to nor an unreasonable application of clearly

13   established federal law.  See text, *supra*, at 40-44.

14       ***Alleged Double Jeopardy Violation (Sung Ground 7)***

15           In her Ground 7, Sung alleges that she was punished twice in violation of the Double Jeopardy

16   Clause when she was sentenced to consecutive terms of imprisonment on the charges of extortion and

17   witness solicitation of a bribe.  She maintains that the offenses constitute the "same offense" under

18   *Blockburger*.  Jurists of reason would not find the rejection of this claim debatable or wrong.  The

19   extortion and conspiracy convictions were reversed on direct appeal, and the State opted to not seek a

20   retrial on the charges on remand.  Sung currently is neither subjected to nor threatened with the prospect

21   of consecutive sentences for extortion and witness soliciting a bribe.  In the final analysis, she served

22   only the one sentence on the conviction for witness soliciting a bribe; and on the record presented to

23   this Court that is the only sentence that she ever will serve in the case.   Ground 7 is moot and does not

24   present a live justiciable controversy.  Reasonable jurists therefore would not find this Court's rejection

25   of the claim debatable or wrong.  See text, *supra*, at 45-46.

26       ***Alleged Cumulative Error (Kwon Ground 4 & Sung Ground 1)***

27           Kwon and Sung allege that they were denied a right to due process in violation of the Fifth and

28   Fourteenth Amendments due to cumulative error.  Jurists of reason would not find the rejection of this

claim debatable or wrong.  Petitioners' argument based upon a collateral impact from the errors on the extortion and conspiracy to commit extortion charges is flawed.  Petitioner's seek to reduce the entirety of the State's "theory of the case" – as to all charges – to the proposition that their civil case was a fraud and baseless.  This "straw man" argument glosses over the fact that the truth or falsity of their allegations had nothing to do with the elements required to establish witness solicitation of a bribe. Given the rejection of petitioners' other claims of error, a determination that alleged cumulative error did not so infect the trial with unfairness as to render the convictions a denial of due process was not objectively unreasonable in this case.  Reasonable jurists therefore would not find debatable or wrong this Court's conclusion that the state supreme court's rejection of this claim was neither contrary to nor an unreasonable application of clearly established federal law.  See text, *supra*, at 46-49.

A certificate of appealability therefore will be denied as to all claims.

IT THEREFORE IS ORDERED that the petition of petitioner Kwon in No. 3:08-cv-00307-LRH-VPC and the petition of petitioner Sung in No. 2:08-cv-917-LRH-VPC both shall be DENIED on the merits and that the consolidated actions shall be DISMISSED with prejudice.

IT FURTHER IS ORDERED that a certificate of appealability is DENIED as to all claims.  See text, *supra*, at 49-55.

The Clerk of Court shall enter final judgment accordingly in favor of respondents and against petitioners Kwon and Sung, dismissing these consolidated actions with prejudice.[75]

DATED this 12th day of September, 2011.

_____
LARRY R. HICKS
UNITED STATES DISTRICT JUDGE

---

[75]The Court expresses no opinion as to whether petitioners should be required to expressly waive any conflict arising from their respective trial counsel pursing this federal habeas matter.  Any such issue would appear to be moot at this juncture, given that petitioners' sentences likely are expired and they are not in a posture to pursue further claims.